# BREWER-ELLIOTT OIL & GAS COMPANY ET AL. *v.* UNITED STATES ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 52. Argued October 12, 13, 1922.—Decided November 13, 1922.

1. Where an act of Congress setting apart and confirming a reservation to the Osage Indians, out of lands formerly occupied but ceded by the Cherokees, described the west boundary as "the main channel of the Arkansas River," and a deed to the United States for the Osages, made by the Cherokees in pursuance of this and

other acts and of a treaty, described the land only by whole town-
ships, and by fractional townships " on the left bank of the
Arkansas River," held, that the deed was to be interpreted in con-
formity with the act, and that the act carried title to land in the
river bed out to the main channel. Pp. 82, 87.

2. Congress has power to make grants of lands below high water
mark of navigable waters in a Territory, to carry out public pur-
poses appropriate to the objects for which the United States holds
the Territory. P. 83. Shively v. Bowlby, 152 U. S. 1, 47.

3. This principle was not affected as to lands within the Louisiana
Purchase by the purpose, declared in the treaty with France, that
statehood should ultimately be conferred on the inhabitants of the
territory purchased. P. 85.

4. A navigable river is one which is used, or is susceptible of being
used in its ordinary condition, as a highway for commerce, over
which trade and travel are or may be conducted in the modes cus-
tomary on water. P. 86.

5. The evidence in this case affords no ground for rejecting the finding
of the two courts below, that the Arkansas River, along the Osage
Reservation in Oklahoma, is not, and never has been, a navigable
stream. P. 86.

6. A grant of land in the bed of a non-navigable river made by the
United States while holding complete sovereignty over the locality
including it, cannot be divested by a retroactive rule or declaration
of the State subsequently created out of that territory, classifying
the river as navigable. P. 87.

7. Such a grant being attacked upon the ground that the river was
navigable and its bed not subject to be granted by the United
States, the question of navigability is not a local but a federal
question. P. 87. Wear v. Kansas, 245 U. S. 154, distinguished.

270 Fed. 100, affirmed.

APPEAL from a decree of the Circuit Court of Appeals,
affirming a decree of the District Court in favor of the
United States, in a suit brought on its own behalf, and as
trustee for the Osage Tribe of Indians, to cancel oil and
gas leases granted the appellants by the State of Okla-
homa covering land constituting part of the bed of the
Arkansas River within the Osage Reservation; and to
enjoin operations under the leases and quiet title in the
United States as trustee.

*Mr. W. A. Ledbetter,* with whom *Mr. Geo. F. Short,* Attorney General of the State of Oklahoma, *Mr. S. P. Freeling, Mr. H. L. Stuart, Mr R. R. Bell* and *Mr. E. P. Ledbetter* were on the brief, for appellants.

*Mr. Assistant Attorney General Riter,* with whom *Mr. Solicitor General Beck* was on the brief, for appellees.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Appeals of the Eighth Circuit affirming that of the District Court for Western Oklahoma. The bill in equity was filed by the United States for itself and as trustee for the Osage Tribe of Indians, against the Brewer-Elliott Oil & Gas Company, and five other such companies, lessees, under oil and gas leases granted by the State of Oklahoma, of portions of the bed of the Arkansas River, opposite the Osage Reservation in that State. It averred that the river bed thus leased belonged to the Osages, and not to Oklahoma, and that the leases were void, that the defendants were prospecting for, and drilling for, oil in the leased lots in the river bed, and were erecting oil derricks and other structures therein, and prayed for the canceling of the leases, the enjoining of defendants from further operations under their leases, and a quieting of the title to the premises in the United States as trustee.

The State of Oklahoma intervened by leave of court and in its answer denied that the Osage Tribe or the United States as its trustee owned the river bed of which these lots were a part, but averred that it was owned by the State in fee. The other defendants adopted the answer of the State.

After a full hearing and voluminous evidence, the District Court found that at the place in question the Arkansas River was, and always had been, a non-navigable

stream, that by the express grant of the Government, made before Oklahoma came into the Union, the Osage Tribe of Indians took title in the river bed to the main channel and still had it. It entered a decree as prayed in the bill. The Circuit Court of Appeals held that, whether the river was navigable or non-navigable, the United States, as the owner of the territory through which the Arkansas flowed before statehood, had the right to dispose of the river bed, and had done so, to the Osages. It also concurred in the finding of the District Court that the Arkansas at this place was, and always had been, non-navigable, and that the United States had the right to part with the river bed to the Osage Tribe when it did so. It affirmed the decree.

The Osage Tribe derived title to their reservation from the Act of Congress of June 5, 1872, entitled "An Act to confirm to the Great and Little Osage Indians a Reservation in the Indian Territory," c. 310, 17 Stat. 228. The act with its recitals is printed in the margin.[1] The de-

---

[1] Chap. CCCX. An Act to confirm to the Great and Little Osage Indians a Reservation in the Indian Territory.

Whereas by the treaty of eighteen hundred and sixty-six between the United States and the Cherokee nation of Indians, said nation ceded to the United States all its lands west of the ninety-sixth meridian west longitude, for the settlement of friendly Indians thereon; and whereas by act of Congress approved July fifteenth, eighteen hundred and seventy, the President was authorized and directed to remove the Great and Little Osage Indians to a location in the Cherokee country west of the ninety-sixth meridian, to be designated for them by the United States authorities; and whereas it was provided by the same act of Congress that the lands of the Osages in Kansas should be sold by the United States, and so much of the proceeds thereof as were necessary should be appropriated for the payment to the Cherokees for the lands set apart for the said Osages west of the ninety-sixth meridian; and whereas under the provisions of the above-mentioned treaty and act of Congress and concurrent action of the authorities of the United States and the Cherokee nation, the said Osages were removed from their former

scription of the tract conveyed is " Bounded on the east by the ninety-sixth meridian, on the south and west by the north line of the Creek country and the main channel of the Arkansas river, and on the north by the south line of the State of Kansas."

The Act of March 3, 1873, c. 228, 17 Stat. 530, 538, directed the Secretary of the Treasury to transfer $1,650,- 600 from Osage funds to pay for lands purchased by the Osages from the Cherokees. The Act of March 3, 1883, c. 143, 22 Stat. 603, 624, appropriated $300,000 to be paid to the Cherokees for this and other lands on condition of their executing a proper deed. The conveyance from the Cherokees to the United States in trust for the Osages recites the Cherokee Treaty of 1866, 14 Stat. 799, the

---

homes in the State of Kansas to a reservation set apart for them in the Indian Territory, at the time of the removal supposed to be west of the said ninety-sixth meridian, and bounded on the east thereby, and upon which said Osages have made substantial and valuable improvements; and whereas by a recent survey and establishment of the ninety-sixth meridian it appears that the most valuable portion of said Osage reservation, and upon which all their improvements are situated, lies east of the said meridian; and whereas it therefore became necessary to select other lands in lieu of those found to be east of the established ninety-sixth meridian for said Osage Indians; and whereas a tract has accordingly been selected, lying between the western boundary of the reservations heretofore set apart for said Indians and the main channel of the Arkansas river, with the south line of the State of Kansas for a northern boundary, and the north line of the Creek country and the main channel of the Arkansas river for a southern and western boundary; and whereas the act of Congress approved July fifteenth, eighteen hundred and seventy, restricts the said reservation for said Osage Indians to " a tract of land in compact form equal in quantity to one hundred and sixty acres for each member of said tribe "; and whereas in a letter of the Cherokee delegation, addressed to the Secretary of the Interior on the eighth day of April, eighteen hundred and seventy-two, on behalf of the Cherokee nation, containing their approval of and assent to the proposition to provide for the settlement of the Osage and Kaw

Acts of June 5, 1872, March 3, 1873, and March 3, 1883, and conveys to the United States the tract of country described in the Act of June 5, 1872, except that, instead of its being bounded by the main channel of the Arkansas River, it is described as townships and fractional townships, "the fractional townships being on the left bank of the Arkansas River." The deed purports to be executed under authority of an act of the Cherokee Nation, which directed a deed under the Act of March 3, 1883, requiring conveyance, satisfactory to the Secretary of the Interior, to the United States in trust for the Osages now occupying said tract, " as they occupy the same."

We have no doubt that the title to the river bed is to be determined by the language of the Act of June 5, 1872,

---

Indians on that portion of the Cherokee country lying west of the ninety-sixth degree west longitude, south of Kansas, east and north of the Arkansas river: Therefore,

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in order to provide said Osage tribe of Indians with a reservation, and secure to them a sufficient quantity of land suitable for cultivation, the following-described tract of country, west of the established ninety-sixth meridian, in the Indian Territory, be, and the same is hereby, set apart for and confirmed as their reservation, namely: Bounded on the east by the ninety-sixth meridian, on the south and west by the north line of the Creek country and the main channel of the Arkansas river, and on the north by the south line of the State of Kansas: *Provided,* That the location as aforesaid shall be made under the provisions of article sixteen of the treaty of eighteen hundred and sixty-six, so far as the same may be applicable thereto: *And provided further,* That said Great and Little Osage tribe of Indians shall permit the settlement within the limits of said tract of land [of] the Kansas tribe of Indians, the lands so settled and occupied by said Kansas Indians, not exceeding one hundred and sixty acres for each member of said tribe, to be paid for by said Kansas tribe of Indians out of the proceeds of the sales of their lands in Kansas, at a price not exceeding that paid by the Great and Little Osage Indians to the Cherokee nation of Indians.

Approved, June 5, 1872.

and that the meaning of the Cherokee deed is to be inter-
preted not as if its words stood alone but in the light of the
acts of Congress in pursuance of which it was made, and
especially of the Act of 1872, under which the Osages
took possession, and which was enough to vest in them
good title to the land described therein without the deed
of 1883. *Choate* v. *Trapp,* 224 U. S. 665, 673; *Jones* v.
*Meehan,* 175 U. S. 1, 10; *Francis* v. *Francis,* 203 U. S.
233, 237, 238.

Coming then to consider the effect of the words of the
Act of 1872 in bounding the Osage reservation by " the
main channel of the Arkansas river," we are met by the
argument that the United States had no power to grant
the bed of the Arkansas River, a navigable stream, to
the Indians, because it held title to it only in trust to
convey it to the States to be formed out of the Louisiana
Purchase which when admitted to the Union must, in
order to be equal in power to the other States, be vested
with sovereign rights over the beds of navigable waters
and streams. The case of *Pollard's Lessee* v. *Hagan,* 3
How. 212, is cited to sustain this proposition. That was
a case where a Spanish claimant of land under navigable
waters in Alabama, seeking to establish title against the
State, relied on a confirmation of an invalid Spanish grant
by the United States enacted after Alabama became a
State. Such a confirmation was held to be ineffective
against the sovereign title of the State. The language
of Mr. Justice McKinley, who spoke for the Court, fully
sustains the argument made here that, even before state-
hood, the United States was without power to convey title
to land under navigable water and deprive future States
of their future ownership. Such a view was not necessary,
however, to the case before the Court, and has since been
qualified by the Court through Chief Justice Taney in
*Goodtitle* v. *Kibbe,* 9 How. 471, 478. *Ward* v. *Race
Horse,* 163 U. S. 504, relied on by counsel for appellants,

does not sustain their contention. The gist of the Court's holding there was that a right to hunt upon the unoccupied lands of the United States so long as game might be found thereon, granted by the United States in an Indian treaty made before the statehood of Wyoming, was not to be construed as intended to continue thereafter or to give immunity from the Wyoming game laws.

The whole subject has been clarified after the fullest examination of all the authorities in a most useful opinion by Mr. Justice Gray, speaking for the Court in *Shively* v. *Bowlby,* 152 U. S. 1. On page 47 the learned Justice says:

"VIII. Notwithstanding the *dicta* contained in some of the opinions of this court, already quoted, to the effect that Congress has no power to grant any land below high water mark of navigable waters in a territory of the United States, it is evident that this is not strictly true."

And he then reviews the cases and thus states the Court's conclusion (pp. 48, 49):

"We cannot doubt, therefore, that Congress has the power to make grants of lands below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory.

"IX. But Congress has never undertaken by general laws to dispose of such lands. And the reasons are not far to seek. . . .

"The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high water mark, may be taken up by actual occupants, in

order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case of some international duty or public exigency, shall be held by the United States in trust for future States, and shall vest in the several States, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older States in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the State, after it shall have become a completely organized community."

We do not think the declared purpose of the Louisiana Purchase Treaty with France that statehood should be ultimately conferred on the inhabitants of the territory purchased, relied on by the appellants, varies at all the principles to be applied in this case. They are the same in respect to territory of the United States whether derived from the older States, Spain, France or Mexico. If the Arkansas River were navigable in fact at the *locus in quo,* the unrestricted power of the United States, when exclusive sovereign, to part with the bed of such a stream for any purpose, asserted by the Circuit Court of Appeals, would be before us for consideration. If that could not be sustained, a second question would arise whether vesting ownership of the river bed in the Osages was for " a public purpose appropriate to the objects for which the United States hold the Territory," within the language of Mr. Justice Gray in *Shively* v. *Bowlby,* above quoted.

We do not find it necessary to decide either of these questions, in view of the finding as a fact that the Arkansas is and was not navigable at the place where the river bed lots, here in controversy, are.

A navigable river in this country is one which is used, or is susceptible of being used in its ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. It does not depend upon the mode by which commerce is conducted upon it, whether by steamers, sailing vessels or flat boats, nor upon the difficulties attending navigation, but upon the fact whether the river in its natural state is such that it affords a channel for useful commerce. *Oklahoma* v. *Texas,* 258 U. S. 574; *Economy Light & Power Co.* v. *United States,* 256 U. S. 113; *The Montello,* 20 Wall. 430; *The Daniel Ball,* 10 Wall. 557, 563. Voluminous testimony was introduced in the District Court upon the issue of navigability. That court considered it all with evident care and had no difficulty in reaching the conclusion that the Arkansas River along the Osage Reservation was not, and had never been, navigable within the adjudged meaning of that term, and that the head of navigation is and was the mouth of the Grand River, near which was Fort Gibson, and this is a number of miles below the Reservation. The Circuit Court of Appeals reviewed this finding and fully concurred in its correctness. Neither the argument nor the record discloses any ground which can overcome the weight which the findings of two courts must have with us. *Washington Securities Co.* v. *United States,* 234 U. S. 76, 78; *Texas & Pacific Ry. Co.* v. *Louisiana R. R. Commission,* 232 U. S. 338; *Chicago Junction Ry. Co.* v. *King,* 222 U. S. 222, 224; *Dun* v. *Lumbermen's Credit Association,* 209 U. S. 20, 24. It is a natural inference that Congress in its grant to the Osage Indians in 1872 made it extend to the main channel of the river, only

because it knew it was not navigable.  This would be consistent with its general policy.  Rev. Stats., § 2476; *Oklahoma* v. *Texas,* 258 U. S. 574; *Scott* v. *Lattig,* 227 U. S. 229, 242; *Railroad Company* v. *Schurmeir,* 7 Wall. 272, 289.  If the Arkansas River is not navigable, then the title of the Osages as granted certainly included the bed of the river as far as the main channel, because the words of the grant expressly carry the title to that line.

But it is said that the navigability of the Arkansas River is a local question to be settled by the legislature and the courts of Oklahoma, and that the Supreme Court of the State has held that at the very point here in dispute, the river is navigable.  *State* v. *Nolegs,* 40 Okla. 479.  A similar argument was made for the same purpose in *Oklahoma* v. *Texas, supra,* based on a decision by the Supreme Court of Oklahoma as to the Red River.  *Hale* v. *Record,* 44 Okla. 803.  The controlling effect of the state court decision was there denied because the United States had not been there, as it was not here, a party to the case in the state court.  *Economy Light & Power Co.* v. *United States,* 256 U. S. 113, 123.  In such a case as this the navigability of the stream is not a local question for the state tribunals to settle.  The question here is what title, if any, the Osages took in the river bed in 1872 when this grant was made, and that was thirty-five years before Oklahoma was taken into the Union and before there were any local tribunals to decide any such questions.  As to such a grant, the judgment of the state court does not bind us, for the validity and effect of an act done by the United States is necessarily a federal question.  The title of the Indians grows out of a federal grant when the Federal Government had complete sovereignty over the territory in question.  Oklahoma when she came into the Union took sovereignty over the public lands in the condition of ownership as they were then, and, if the bed of a non-navigable stream had then become the property

of the Osages, there was nothing in the admission of Oklahoma into a constitutional equality of power with other States which required or permitted a divesting of the title. It is not for a State by courts or legislature, in dealing with the general subject of beds of streams, to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the State, at the time of her admission, under the constitutional rule of equality here invoked.

It is true that, where the United States has not in any way provided otherwise, the ordinary incidents attaching to a title traced to a patent of the United States under the public land laws may be determined according to local rules; but this is subject to the qualification that the local rules do not impair the efficacy of the grant or the use and enjoyment of the property by the grantee. Thus the right of the riparian owner under such grant may be limited by the law of the State either to high or low water mark or extended to the middle of the stream. *Packer* v. *Bird*, 137 U. S. 661, 669.

We said in *Oklahoma* v. *Texas*, 258 U. S. 574, 594:

"Where the United States owns the bed of a nonnavigable stream and the upland on one or both sides, it, of course, is free when disposing of the upland to retain all or any part of the river bed; and whether in any particular instance it has done so is essentially a question of what it intended. If by a treaty or statute or the terms of its patent it has shown that it intended to restrict the conveyance to the upland or to that and a part only of the river bed, that intention will be controlling; and, if its intention be not otherwise shown, it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the State in which the land lies. Where it is disposing of tribal land of Indians under its guardianship the same rules apply."

In government patents containing no words showing purpose to define riparian rights, the intention to abide the state law is inferred.    Mr. Justice Bradley, speaking for the Court in *Hardin* v. *Jordan,* 140 U. S. 371, 384, said:

"In our judgment the grants of the government for lands bounded on streams and other waters, without reservation or restriction. of terms, are to be construed as to their effect according to the law of the State in which the lands lie."

Some States have sought to retain title to the beds of streams by recognizing them as navigable when they are not actually so.    It seems to be a convenient method of preserving their control.    No one can object to it unless it is sought thereby to conclude one whose right to the bed of the river, granted and vesting before statehood, depends for its validity on non-navigability of the stream in fact. In such a case, navigability *vel non* is not a local question. In *Wear* v. *Kansas,* 245 U. S. 154, upon which the appellants rely, the patent of the United States under which Wear derived title was a grant, made before statehood, of land bordering on the Kansas River without restriction, reservation or expansion.    The state tribunal took judicial notice of the navigability of the river, refused to hear evidence thereon, and held that the patent to land on a navigable stream did not convey the bed of the river. The United States by its unrestricted patent was properly taken to have assented to its construction according to the local law.    Whether the local law worked its purpose by conclusively determining the navigability of the stream, without regard to the fact, or by expressly denying a riparian title to the bed of a non-navigable stream, was immaterial.    In either view the result there would have been the same.    The case of *Donnelly* v. *United States,* 228 U. S. 243, is to be similarly distinguished, if, indeed, it can be said after the qualification of the opinion, 228 U. S. 708, 711, to require distinguishing.

*The decree of the Circuit Court of Appeals is affirmed.*