## HASKELL v. GYPSY OIL CO.*

Circuit Court of Appeals, Eighth Circuit.
June 13, 1928.

No. 7994.

**Stipulations ⬉14(5)—Under stipulation decreeing title to oil lands in Indians, assignee of state's lessee held liable to Indians' lessee for net profits from oil produced and sold by him.**

Lessee from state and lessee from Osage Nation of part of oil lands involved in suit by the United States, to which they were parties, to cancel leases from the state on the ground that the bed of the river where the state's leases were located belonged to the Tribe, having entered into a stipulation reciting the claims of both to the land within the lease from the

state, and that the state's lessee was operating it for oil, and that decree should be entered quieting the title of the one or the other to its lease, when and as it should be determined that the title to the land was in the state or the Tribe, and that the receiver theretofore appointed in the suit should as to such land be discharged, each of such parties being satisfied of the financial responsibility of the other, and to look to such responsibility for compensation, for any injury it may sustain by reason of the possession or development, *held* that, title to the land being adjudged in the Tribe, the assignee of the state's lessee, who took with notice of the recorded stipulation, was liable to the Indians' lessee, as on a contract, embodied in the stipulation, for the net profits from oil produced and sold by him; such liability being unaffected by an order entered on the stipulation.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

In a suit by the United States, to which C. J. Haskell and the Gypsy Oil Company were parties, judgment was entered under a stipulation for the company against Haskell, from which he appeals. Affirmed.

H. L. Stuart, of Oklahoma City, Okl. (W. A. Ledbetter, R. R. Bell, and E. P. Ledbetter, all of Oklahoma City, Okl., on the brief), for appellant.

Redmond S. Cole, of Tulsa, Okl. (James B. Diggs, William C. Liedtke, Russell G. Lowe, and C. L. Billings, all of Tulsa, Okl., on the brief), for appellee.

Before LEWIS, Circuit Judge, and SCOTT and DAVIS, District Judges.

LEWIS, Circuit Judge. The State of Oklahoma, asserting ownership of the Arkansas River bed below high water mark where it bounds the Reservation of the Osage Tribe of Indians on the southwest, gave leases on the bed which purported to grant the right to develop and take the underlying deposits of oil and gas on stipulated royalties to be paid the lessor. Thereupon the United States, as trustee and guardian for the Tribe, filed its bill against several of the State's lessees, including the Scioto Oil Company, to cancel their leases on the ground that the bed and mineral deposits belonged to the Tribe and not to the State. The bill alleged that by treaty and statutes made and passed prior to statehood the title of the Osage Nation extended to the middle of the main channel, that the river was non-navigable and tribal title to that extent also accrued from ownership of land on the northeasterly bank. The State of Oklahoma and the commissioners of the State Land Office intervened and denied

the title set up, and in their petition alleged the river was a navigable stream and that the State owned the bed of the river below high water mark, which limited riparian rights, and that the leases given to the defendants were valid and asked that it be so adjudged. On final hearing the court found that title to the river bed and the mineral deposits out to the main channel from the northeasterly bank was in the Tribe, and it was decreed that title in the Tribe thereto be quieted and the State's leases canceled. United States v. Brewer-Elliott Oil & Gas Co. et al. (D. C.) 249 F. 609; Brewer-Elliott Oil & Gas Co. et al. v. United States (C. C. A.) 270 F. 100; Brewer-Elliott Oil & Gas Co. et al. v. United States et al., 260 U. S. 77, 43 S. Ct. 60, 67 L. Ed. 140.

Before the case came on for trial the United States as plaintiff and the State and the Commissioners of the State Land Office as interveners filed a stipulation in the cause, agreeing that development and production of oil and gas should go on under the supervision of a receiver to be appointed by the court, "that oil and gas produced from said lands under said leases over and above the rental, royalty and bonus portion thereof shall become and be the property of said lessees, and their assigns, free of any claim of plaintiff or the said intervenors," that the rental, royalty and bonus on production should be paid to the court's receiver and held by him pending the litigation and until it was determined to whom those payments would belong. On June 15, 1914, the court entered its order on the stipulation. That order, in recognition and approval of that part of the stipulation quoted supra, contains this:

"It is further ordered and adjudged that all oil and gas produced from any of said lands under the said leases in excess of the amount stipulated in said leases to be paid as rentals, royalties and bonuses, shall become and be the property of the lessees of the Commissioners of the Land Office of the State of Oklahoma and their assigns, free of any claim on the part of complainant or the said intervenors."

The Gypsy Oil Company, appellee here, was not a party to the suit. It held an oil and gas lease from the Osage Nation and claimed the right to take oil and gas under the bed on the Osage side, which was in conflict with the claimed right of the Scioto Oil Company under its lease from the State to all oil found below high water mark. The Gypsy Oil Company, for the purpose of excluding the Scioto Company from the part of the bed in dispute, put up a wire fence. The

stream "has a winding course, broad channel and a bed of sand which moves and lodges with the currents."

On motion of the Scioto Oil Company, made September 9, 1914, the Gypsy Oil Company was made a party defendant in the cause, the Scioto Oil Company was granted leave to file its cross-bill against the Gypsy Company, the court extended the supervisory powers of its receiver over the leases on the ground in controversy between those two companies and ordered him to take possession of all oil and gas produced therefrom, to sell and dispose of it, to pay out of the proceeds the expense thereafter to be incurred in operating the wells, and always retain enough money therefrom to pay the maximum royalties provided for in the Scioto Oil Company's lease. The receiver's power in the premises was declared to be the same as provided in the court's order of June 15, 1914. The Scioto Oil Company filed its cross-bill that day against the Gypsy Oil Company, alleging that the latter company had erected a wire fence around the ground in controversy and that it claimed to be in possession of a portion of the river bed so enclosed and was excluding all other persons therefrom, that the Gypsy Oil Company had drilled one oil well below high water mark, which well was on the property claimed by the Scioto Company under its lease, that the Gypsy Company was publicly asserting its ownership of said river bed and all oil and gas rights therein by virtue of its lease upon the upland adjacent thereto from the Osage Nation and had thus clouded the title of the Scioto Company to oil produced from its wells, so that it was unable to sell its oil and collect the proceeds therefor, and that it would be so prevented in the future as long as said claims were made by the Gypsy Oil Company, unless the receiver appointed by the court took charge of the property, and it was prayed that the receiver who had been appointed be placed in charge with authority to sell the oil and gas produced and collect the proceeds therefor. It was further prayed that the Scioto Company's title be quieted.

The Gypsy Company filed its answer to the cross-bill on October 10, 1914. It admitted that it was in possession of and had fenced the land in controversy below high water mark on the Osage side to which the Scioto Company made claim under its lease from the State. It alleged that the State had no title to the bed and the Scioto Company was without right under its lease to take gas and oil from the premises in controversy. It alleged title in the Osage Nation, which had

granted to the Gypsy Company on October 13, 1913, certain oil and gas mining leases, that by virtue thereof it was in possession of the premises and was engaged in developing and operating the same for oil and gas as it had a right to do, in accord with the terms of its lease from the Osage Nation, that it had drilled oil and gas wells under its leases and alleged that the Scioto Company was without any right or title to said land or to extract and take oil therefrom; and it prayed that the cross-bill be dismissed.

Thereafter on December 26, 1916, the Scioto Company and the Gypsy Company filed in court a stipulation bearing date December 8, 1916, the material parts of which we summarize in part and quote in part: The Gypsy Company claims that its lease extends to low water mark or center of the Arkansas River; the Scioto Company is operating an oil and gas mining lease executed by the Commissioners of the Land Office of the State of Oklahoma to the bed of the Arkansas River, and it claims that the State is owner of the bed below high water mark; if it should be finally determined in the cause that the State owns the bed below high water mark, then decree shall be entered quieting the title of the Scioto Company to its lease and barring the Gypsy Company from any interest therein; if it shall be finally determined that the Gypsy Company's lease extends to low water mark or center of the stream, decree shall be entered so establishing the rights of the Gypsy Company;

"It is further agreed and stipulated between the parties hereto that, so far as the land above described is concerned, the receiver heretofore appointed in this cause for the working interest may be discharged without cost to the Gypsy Oil Company, each of the parties hereto being fully satisfied as to the financial responsibility of each other, and to look to such responsibility for compensation of any injury it may sustain by reason of the possession or development of any portion of the above described land."

On January 5, 1917, the court entered an order on the stipulation discharging the receiver from any further supervision of operation of the wells on the land in conflict between the Scioto Company and the Gypsy Company and ordered him to deliver possession of all wells thereon to the Scioto Company or to its successor or assigns who were to operate the lease in accordance with the provisions and requirements of the order of June 15, 1914, except the receiver was to continue to collect and hold the royalties on the oil and gas produced, "but that all other proceeds of said oil lease, commonly known as the working interest, shall, from and after said first day of January, 1917, be received by, be and become the property of Scioto Oil Company, as provided in said original order of June 15, 1914." The receiver was directed to file a full and complete inventory of all equipment on the premises and take a receipt of the Scioto Company therefor and to make and file his report of all moneys received by him up to January 15, 1917, while he had supervised operations under the lease.

The decree in the main cause was entered on the merits on February 21, 1918. It was therein adjudged:

"* * * That the Osage Tribe of Indians in Oklahoma acquired, as a part of its reservation, the title to the bed of the Arkansas River lying adjacent to the lands of said reservation, in the State of Oklahoma, as far as and extending to the middle of the main channel of said river, together with the underlying oil, gas and other minerals, by virtue of the Act of Congress approved June 5, 1872 [17 Stat. 228], and as confirmed by the deed of the Cherokee Nation of Indians, dated June 14, 1883, that the title to said portion of said river bed and said minerals is subject to lease only for the benefit of said Tribe, as provided by the laws of the United States, and as may be hereafter provided by said laws, and that the said title of said Tribe and the United States as its trustee, should be and is hereby quieted; * * * that the defendant lessees and their sub-lessees, assignees and successors in interest, and the intervenors herein, and each of them, have no right, title or interest to or in said portion of said river bed or minerals, and that the leases therefor of the defendant companies and of their sub-lessees, assignees and successors from the State of Oklahoma and its officer and agents involved in this cause be and they are hereby canceled and held for naught."

This decree was made final on February 12, 1923, after it had been confirmed on appeal by both the Circuit Court of Appeals and the Supreme Court of the United States.

Appellant Haskell became assignee of the Scioto Oil Company soon after the stipulation between that company and the Gypsy Oil Company was entered into on December 8, 1916, and he had come into the cause as a defendant, asserting title to the river bed in the State and the validity of the Scioto Company's lease which he had acquired. The court also entered a decree on February 12, 1923, in which it was adjudged that the

Scioto Oil Company and C. J. Haskell had no right, title, interest or estate in or to that portion of the bed of the river lying adjacent to the lands of the Osage Indian Reservation as far as and extending to the middle of the main channel of said river in section 6, etc., or to the oil or gas underlying the same and that the oil and gas mining lease, and assignment thereof, held by C. J. Haskell be and the same were canceled and held for naught, and that the title of the Gypsy Oil Company to the oil and gas underlying said premises and its oil and gas mining lease thereon be and the same were quieted against any and all claims of the Scioto Company and Haskell. The Scioto Company and Haskell were enjoined from extracting oil or gas from said premises and from interfering with the production of oil or gas therefrom by the Gypsy Oil Company. The Gypsy Oil Company was granted leave to file its cross-bill against Haskell, and Haskell was ordered to plead thereto. The Gypsy Oil Company filed its cross-bill against Haskell, alleging that he had taken the lease of the Scioto Company by assignment, that the Gypsy Company's title under its lease had been affirmed and by decree quieted in it as against the Scioto Oil Company and Haskell, that Haskell had been in possession of that part of the bed of the stream claimed under the Scioto Company's lease ever since the court made its order of January 5, 1917, that he was still in possession thereof, that he at no time had any right thereto, that he had produced and taken from the premises large quantities of oil and gas and had refused and was still refusing to account to the Gypsy Company therefor, that he had sold and received for oil so produced by him from said premises a sum in excess of $400,000; and it was prayed that Haskell be required to answer the cross-bill and to account to the Gypsy Company for the oil so taken by him. Haskell answered this cross-bill on September 13, 1923, and he therein claims, which is his principal contention here, that under the orders of June 15, 1914, and January 5, 1917, he was entitled to receive and hold as his own property all of the oil produced over and above the royalties therefor,—that is, the so-called working interest; and is in no way liable therefor to the Gypsy Company. That is the issue on this appeal.

The court rejected Haskell's contention, found that issue in favor of the Gypsy Oil Company, referred the accounting to a master to take and report the evidence and his conclusions of law. The master allowed Haskell his expenses in producing and market-

ing the oil, which being deducted from his gross receipts left in the hands of Haskell, as he found, profits to the amount of $140,-000, and he reported that the Gypsy Oil Company was entitled to recover that sum from him. Exceptions of Haskell to the master's report were overruled, the report confirmed by the court and judgment entered against him for the $140,000. This is the judgment appealed from.

From what has been said it fairly appears that the Scioto Oil Company, and Haskell after he became its assignee, were desirous of continuing the production of oil from the ground in dispute, that they could not dispose of the accumulating production as long as the Gypsy Oil Company was publicly asserting the oil produced did not belong to them; and this condition brought about the stipulation that was entered into between the Scioto Company and the Gypsy Company on which the court made its order of January 5, 1917, providing that all oil produced over and above the royalty share, commonly known as the working interest, should be received by and be and become the property of the Scioto Oil Company. That was undoubtedly intended as an assurance to the purchaser of the oil that he would not be again liable to any one else therefor; but this stipulation had expressly provided: " * * * each of the parties hereto being fully satisfied as to the financial responsibility of each other, and to look to such responsibility for compensation of any injury it may sustain by reason of the possession or development of any portion of the above described land." It is clear from this language that each of the parties to the stipulation reserved the right to hold the other for compensation because of any injury that might be suffered from the development of the premises and production of oil, dependent on final determination of the main cause. The learned district judge, in passing on exceptions to the master's report, considered the contention now made by appellant and in relation thereto said this:

"If it be assumed that by the order of January 5, 1917, the court adjudicated the title in favor of the Scioto Oil Company, as against the Gypsy Oil Company, it was apparently without a hearing of the controversy and inadvertent, and could not have been intended to divest the Gypsy Oil Company of any rights, especially as it followed a stipulation which disclosed and conceded the claim of that company. And under the circumstances, the order in that respect should be vacated on motion, or mere sug-

gestion, to prevent an injustice. No appearance seems to have been made for the Gypsy Oil Company and as far as the record shows there was no occasion for an order of such far-reaching character, as is claimed for it.

"It is true the Gypsy Oil Company might have appealed from that order. But this is deemed to have been unnecessary, for it had been previously stipulated (December 8, 1916) between the two companies that their leasehold interests should abide the final decree in the main case, and that each of the parties being fully satisfied as to the financial responsibility of each other might look to such responsibility for compensation for any injury by reason of the possession or development of the land. Hence, an adjudication, if made, that the working interest should become the property of the Scioto Oil Company might well subsist and still compensation be awarded for any injury to accrue therefrom to the Gypsy Oil Company.

"The situation of these parties is as follows: The Gypsy Oil Company had a valid riparian lease from the Osage Tribe which, as the result of the final decree in the main suit, extended to the middle of the river channel. The Scioto Oil Company had an invalid lease from the state upon a portion of the river beds, within the bounds of the Gypsy lease, as finally adjudicated, and was therefore wrongfully in possession under that lease. They were rival claimants to the property. The Scioto Oil Company elected to remain in possession and operate the lease, and to contest for its validity with the Government, representing the Tribe, and finally with the Gypsy Oil Company. It was under no obligation to operate the lease, but chose to do so, at its peril. And the litigation having ended adversely to its claim against both the Osage Tribe and the Gypsy Oil Company, the royalties properly went to the Tribe, and the profits from the working interest should go to the Gypsy Oil Company. No other decision would reimburse that company for its loss upon a lease, for which it has rendered up the necessary consideration to the Tribe. If it should now be held to sustain that loss, then a clear injustice would be visited on that company. The correct measure of compensation or damages against the Scioto Oil Company, or rather its successor, Mr. Haskell, is the amount of net returns he has realized from the working interest under his operation."

We think there is no answer to the soundness of the view thus expressed, and that it would be unjust and inequitable to hold otherwise. Haskell stands in the shoes of his assignor. He took the assignment with notice of the stipulation, which was of record in the cause. He does not deny actual notice. Strictly speaking, he was not liable in an accounting, as that term is technically understood, for the oil which he produced; but he was liable as on contract, embodied in the stipulation, for compensation on account of injuries that might be inflicted on the Gypsy Oil Company in taking oil which he had no right to take, the taking of which resulted in damage to the leasehold rights of the Gypsy Company. That right was reserved and safeguarded in the stipulation, and neither decree relied on passed on it or in any wise referred to it. The injury in the way of damages to be assessed as contemplated by the stipulation, would be at least as much as the net profits he obtained from the oil produced and sold; and that was the basis on which the $140,000 was arrived at and fixed. We are convinced this was not error.

It is further contended by counsel for appellants that items were charged against him in the so-called accounting for which he was not liable, and that certain credits were denied him to which he was entitled. We have read the evidence in those respects and think the contentions are without merit.

The judgment is affirmed.