### GABLE et al. v. ANGLE et al.
### No. 1246.

District Court, W. D. Oklahoma.
July 19, 1933.

Huddleston & White, of Oklahoma City, Okl., for plaintiffs.

W. N. Stokes, Geo. W. Grant, A. C. Hough, Miley, Hoffman, Williams, France & Johnson, W. R. Withington, Ledbetter, Stuart, Bell & Ledbetter, Bleakmore, Barry, Farmer & Lee, Everest, McKenzie, Halley & Gibbens, M. D. Green, Embry, Johnson, Crowe & Tolbert, Twyford & Smith, Moss & Powell, Leo G. Mann, J. H. Jarman, D. D. Jennings, G. A. Paul, Geo. M. Nicholson, Willingham & Fariss, Shirk, Danner & Phelps, Ray Trosper, Billups & Billups, McPherren & Maurer, E. E. Blake, Everest, Dudley & Brewer, Keaton, Wells, Johnston & Barnes, Hayes, Richardson, Shartel, Gilliland & Jordan, Harlan T. Deupree, Municipal Counselor, Snyder, Owen & Lybrand, Henry L. Goddard, J. C. Davis, J. Q. A. Har-

rod, C. W. Clift, and Allen & Jarman, all of Oklahoma City, Okl., Empire Companies, Legal Dept. (by Warren T. Spies and Hayes McCoy), of Bartlesville, Okl., and W. P. Z. German and Alvin F. Molony, both of Tulsa, Okl., for defendants.

VAUGHT, District Judge.

Plaintiff Cora M. Gable, and thirty-six coplaintiffs, bring this action against defendant J. B. Angle, and ninety codefendants, alleging in substance that plaintiffs are the owners of certain·real estate in Oklahoma county, Okl., through which the North Canadian river flows and has formed a new channel; that prior to the formation of the new channel the said North Canadian river flowed through the lands of the defendants; and that said channel through the lands of the defendants was the original channel of the North Canadian river; that the said original channel has been abandoned by said river and the new channel formed by the river is wholly upon the lands of the plaintiffs.

The plaintiffs invoke a statute of the state of Oklahoma which was enacted by the territorial Legislature of the territory of Oklahoma, and later adopted by the Legislature of the state of Oklahoma. The statute in question is as follows: "If a stream forms a new course, abandoning its ancient bed, the owners of the land newly occupied take, by way of indemnity, the ancient bed abandoned, each in proportion to the land of which he has been deprived." 1931 Oklahoma Statutes, § 11736; C. O. S. 1921, § 8561; Revised Laws Oklahoma 1910, § 6755; Statutes of 1903, § 4189; Statutes of 1893, § 3863; Statutes of 1890, § 4293.

The lands occupied by the original channel of the river are set out in the bill and also the lots and lands through which the present channel runs.

There is no contention by plaintiffs that the North Canadian river at Oklahoma City is a navigable stream either in fact or in law.

Plaintiffs pray that they be decreed title to the original river bed, in lieu of the lands lost by them, by the formation of the present river bed, or channel.

The defendants have filed their motion to dismiss the bill for want of equity and challenge the constitutionality of the act relied upon by the plaintiffs, and the only question to be determined here is whether or not the statute above quoted is repugnant to the Organic Act of Congress of May 2, 1890 (26 Stat. 81), the public land laws of the United States, and to the Constitution of the state and of the United States.

The Revision of the Oklahoma Statutes in 1910 excluded the words "navigable or not navigable" as superfluous, the act prior to 1910 using the words "navigable or not navigable." The statute in question was adopted by the territorial Legislature of the territory of Oklahoma in 1890, evidently the first Legislature, and it has also been carried forward in the Oklahoma state statutes.

The lands constituting Oklahoma were public lands and the property of the United States prior to the formation of Oklahoma Territory, and the particular lands in question were filed upon by settlers at the opening of the territory in 1889, the titles thereto acquired by the settlers under grants or patents from the United States government, and thereafter these lands, in whole or in part, were subdivided as parts of the town site of Oklahoma City. The history of this section is rather interesting.

The plaintiffs cite in their brief section 563 from the Code of Napoleon, which section is as follows: "If a river or a navigable stream, capable of admitting floats or not, form a new course, abandoning its ancient bed, the proprietors of the land newly occupied take, by title of indemnity, the ancient bed abandoned, each in proportion to the land of which he has been deprived."

The section of the Oklahoma statute is adopted from the Dakota statutes, as were most of the Oklahoma statutes, and plaintiffs allege the Dakota statute was taken from the Napoleonic Code. Plaintiffs further contend in their brief that since what is now Oklahoma was part of the Louisiana Purchase from France, the lands contained in the Louisiana Purchase were impressed with the French statutes or Code of Napoleon and therefore the Oklahoma statute is consistent with prior statutes, even back to the Napoleonic Code.

This contention by the plaintiffs is wholly without foundation, even if the theory of the plaintiffs were correct (which constitutes an unusual strain on the imagination). The rights of all of the parties to this action were derived from the United States and no rights attached in so far as any of the parties to this litigation prior to the time of the Louisiana Purchase.

The Supreme Court of Oklahoma, it appears, has never passed upon this statute. But the question of the rights of riparian owners, both as to navigable and nonnaviga-

ble streams in Oklahoma, has been a source of much litigation in the federal courts. In fact, discovery of oil in Oklahoma has had the effect of resurrecting every statute of every possible character which would give the slightest relief to a claimant to land under which oil has been discovered or is likely to be discovered. The disposition of litigants on this question may be likened to the habits and characteristics of the North Canadian river itself. It has changed its course with every freshet and its river bed has been all over that section of Oklahoma along the North Canadian river. The course of the river has varied from a few feet to as much as a half mile or a mile at various points. The stream at high tide always follows the course of least resistance.

However, when the Louisiana Purchase was made by President Jefferson in 1803, the title to the lands contained in the Louisiana Purchase passed to the United States and they were treated as public lands. The disposition of these lands is responsible for the development of a great part of our nation.

There can be no question but that since the United States became the owner of these lands their disposition and all regulations relative to the rights of individuals, and particularly the rights of riparian owners to the beds of rivers, rested solely with Congress, and Congress early assumed this responsibility. Title 43, § 931, USCA, is as follows: "All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both."

This statute was enacted on May 18, 1796 (section 9 [1 Stat. 468]), and has been continued in force as a law of the United States since. It was re-enacted in 1803 (Act March 3, 1803, § 17 [2 Stat. 235]) and has been brought forward in its original form to the present.

There has never been any question but that in the territory of Oklahoma, prior to the disposition of the public lands by the United States, title to the beds of all navigable rivers or streams vested in the United States and since Oklahoma's admission as a state to the Union such rights of the United States passed to the state of Oklahoma. In U. S. v. State of Utah, 283 U. S. 73, 51 S. Ct. 438, 440, 75 L. Ed. 844, Chief Justice Hughes says: "In accordance with the constitutional principle of the equality of states, the title to the beds of rivers within Utah passed to that state when it was admitted to the Union, if the rivers were then navigable; and, if they were not then navigable, the title to the river beds remained in the United States."

At the time of the opening of Oklahoma Territory for settlement, the title to the lands in question vested in the United States, and as these lands were filed upon by settlers and their claims recognized and proven, the title from the United States passed to the individual grantee, without reservation.

In U. S. v. Brewer-Elliott Oil & Gas Co. (D. C.) 249 F. 609, 624, the first question raised in the case was whether or not the Arkansas river along the western border of the Osage Nation was a navigable stream. The court held that it was not a navigable stream and therefore that the Osage Nation, as the riparian proprietor, owned the bed of the stream to its center. "It follows, as a matter of law, that the Osage Tribe acquired the title to the river bed to the middle of the main channel along the south boundary of its reservation, now Osage county, and at the locations in controversy, and thereby became and is the sole owner of the underlying oil, gas, and other minerals, and that the United States holds the title to such portion of the river bed and said minerals in trust for the tribe."

This opinion was written by the lamented Judge Cotteral of this district. The case was appealed to the Circuit Court of Appeals (270 F. 100) and later to the Supreme Court of the United States (260 U. S. 77, 43 S. Ct. 60, 67 L. Ed. 140), where Judge Cotteral's opinion was sustained.

In the same case on appeal to the Circuit Court of Appeals, 270 F. 100, 108, Judge Sanborn, in writing the opinion, said:

"The United States has always been both sovereign and proprietor in its territories. As such it has always had the right and power to dispose absolutely of any of its public land therein, high or low, wet or dry. While it has held its public lands in its territories below high-water mark under navigable waters in trust for future states, while it has not conveyed them by general laws and has acted upon the policy, unless in some case of international duty or public exigency, of leaving the administration and disposition of the sovereign rights in navigable waters and in the soil under them to the control of future states when they should be admitted to the Union, nevertheless it has always possessed and has

frequently exercised the absolute power to grant such lands and any interest it had in them irrevocably whenever it became necessary to do so to perform international obligations or to carry out other public purposes appropriate to the objects for which it has held the lands in its territories. * * *

"It has never held its public lands in the territories under unnavigable waters under any such trust, but it has always had and exercised the absolute right to grant and dispose of such lands absolutely as appurtenant to and parts of the property granted or conveyed by it to the riparian owners of the banks adjacent thereto according to the existing law upon the subject of the rights of riparian owners at the times of the respective grants. * * *

"There was not at the time of the original grant in 1838 or when the title thus granted was vested in the Osage Tribe under the act of 1872 and the deed of 1883 any general or local law conditioning these grants to the effect that the Arkansas river at the place of the leased premises, though unnavigable in fact, was navigable in law. Those grants therefore divested the United States of all right and title to that part of the bed of the Arkansas river here in controversy and vested that right and title in the Osage Tribe. * * * *"

Immediately following the opening of the territory of Oklahoma, the lands containing the river beds now in question were granted to individual settlers, and these settlers, on taking title to their lands, took the riparian rights to nonnavigable river beds on or adjacent to said lands under the then existing laws of the United States and those rights are fully protected by clause 2, art. 6, of the Constitution of the United States, which reads as follows: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

■■ The state law now in question was passed by the Legislature of Oklahoma Territory, when there was in force the statute which had been enacted by Congress in 1796, otherwise known as section 2476 of the Revised Statutes of the United States hereinbefore set out, containing the following clause:

"* * * and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both." 43 USCA § 931.

Did the territory of Oklahoma have the power to enact the section of the statute relied upon by the plaintiffs in this case? This court is of the opinion that the territory had no such power, for it was directly in conflict with the section of the federal statute above quoted which in effect gives riparian owners the right to the river bed to the center of the stream. And, furthermore, it was beyond the power of the territorial Legislature to legislate relative to matters wholly within the jurisdiction of the United States. Another question which arises is: Did the state of Oklahoma have the power to enact this statute?

In Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 87, 43 S. Ct. 60, 64, 67 L. Ed. 140, Mr. Chief Justice Taft, in rendering the opinion of the court said:

"Oklahoma when she came into the Union took sovereignty over the public lands in the condition of ownership as they were then, and if the bed of a nonnavigable stream had then become the property of the Osages, there was nothing in the admission of Oklahoma into a constitutional equality of power with other states which required or permitted a divesting of the title. It is not for a state by courts or legislature, in dealing with the general subject of beds of streams to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the state, at the time of her admission, under the constitutional rule of equality here invoked.

"It is true that where the United States has not in any way provided otherwise, the ordinary incidents attaching to a title traced to a patent of the United States under the public land laws may be determined according to local rules; but this is subject to the qualification that the local rules do not impair the efficacy of the grant or the use and enjoyment of the property by the grantee."

And the sixth syllabus of this opinion states: "A grant of land in the bed of a non-navigable river made by the United States while holding complete sovereignty over the locality including it, cannot be divested by a retroactive rule or declaration of the State subsequently created out of that territory, classifying the river as navigable."

This court, therefore, is of the opinion that the section of the statute relied upon by the plaintiffs is clearly unconstitutional and void; that its enactment was beyond the legislative power of the territory of Oklahoma; and that its enactment by the Legislature of the state of Oklahoma was clearly beyond the power of the Legislature and therefore is void.

The court further is of the opinion that the title to the river bed of the original channel vests in the defendants and that a change in the river channel did not affect their title to the property.

The further conclusion is that the bill is without equity and that the various motions to dismiss should be, and are hereby, sustained.

Exception is allowed plaintiffs.