## THE STATE OF ALABAMA, COMPLAINANT, *v.* THE STATE OF GEORGIA.

The boundary line between the States of Georgia and Alabama depends upon the construction of the following words of the contract of cession between the United States and Georgia, describing the boundary of the latter, viz: "West of a line beginning on the western bank of the Chattahoochee river, where the same crosses the boundary between the United States and Spain, running up the said river and along the western bank thereof."

It is the opinion of this court that the language implies that there is ownership of soil and jurisdiction in Georgia, in the bed of the river Chattahoochee, and that the bed of the river is that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme drought of the summer or autumn.

The western line of the cession on the Chattahoochee river must be traced on the water line of the acclivity of the western bank, and along that bank where that is defined; and in such places on the river where the western bank is not defined, it must be continued up the river on the line of its bed, as that is made by the average and mean stage of the water, as that is expressed in the conclusion of the above-recited paragraph.

*State of Alabama* v. *State of Georgia.*

By the contract of cession, the navigation of the river is free to both parties.

See the case of Howard *v.* Ingersoll, 13 Howard, 381, and the correction of its syllabus in the errata in 14 Howard in this, that "the boundary line runs along the top of the high western bank," instead of "the boundary line runs up the river, on and along its western bank, and the jurisdiction of Georgia in the soil extends over to the line which is washed by the water wherever it covers the bed of the river within its banks."

THIS was a case of original jurisdiction in the Supreme Court, under that article in the Constitution which confers jurisdiction over controversies between two or more States.

The State of Alabama filed her bill in this court at December term, 1855. After stating the compact of 1802 between the United States and Georgia, the bill stated the claim of Alabama as follows:

The complainant further states, that this line can only be ascertained with certainty and accuracy by a just and proper construction of the agreement and cession aforesaid, made and entered into as aforesaid by and between the State of Georgia and the said United States, and that, by a just and proper construction thereof, the said line commences at a point where the 31st degree of north latitude crosses the Chattahoochee river, and on the western bank of said river, on that part or portion of the said bank that reaches to or touches the water at ordinary or common low water, and runs up said river and along the western bank thereof, and on said portion of said bank that touches the water at its ordinary or common height, until said line reaches the point on said river from whence it leaves the same in a straight direction to Nickajack—in other words, that said line, so far as it runs on the bank of the Chattahoochee river, runs upon the western bank at the usual or common low-water mark. And as evidence that the line as above described is the true and correct line according to the true intent and meaning of said agreement and cession, your complainant states, that the banks of said river over and upon which said line runs, though at some few places high and steep, over which the water never passes, yet said banks are mostly low and flat, so that when the river is high, or when there is a usual or common freshet, the water of said

river spreads over the land at some places as much as a half mile, at some places less, and other places more than a half mile west from the common low-water mark. And your complainant cannot and never has believed that it was the intention, either of the State of Georgia or of the United States, that said line was to be placed on what may be termed the high-water mark of said river, at the time they entered into the agreement and cession aforesaid, not only on account of the uncertainty in ascertaining and locating the same, but also for the further reason, that at some places on said river the jurisdiction of the State of Georgia would pass far west of the river at its ordinary height, whilst at other places, where the banks or bluffs are high and steep, it would pass but little or none at all beyond the line marked by the ordinary or common stage of the water.

Influenced by these reasons, as well as by the consideration that the line of ordinary low-water mark is readily and easily ascertained, the State of Alabama has ever claimed that said line runs upon the bank where the water touches the same when the river is at its ordinary or common height—that is, that said line runs on the western bank of said river at usual or common low-water mark, and not on the bank at high-water mark. And your complainant has ever claimed and exercised jurisdiction all along and upon said bank to low-water mark, as above described, until the line reaches that point on the river from whence it starts directly to Nicka-jak.

The State of Alabama then called upon the State of Georgia to answer the following questions:

1. Whether or not the said defendant does not claim all the lands on the western bank of the Chattahoochee river, north of the 31st degree of north latitude, up to the point or place where the line that separates the State of Alabama from the State of Georgia leaves the bank of said river in a straight direction for Nickajack, and whether she does not claim and assert a right to exercise jurisdiction and authority over all of said land on the western side of the Chattahoochee river up to high-water mark?

2. Whether the defendant does not claim that the jurisdiction and soil all along the bank of said river, up to high-water mark, belong exclusively to her, the said State of Georgia, and that the line separating the State of Alabama from the State of Georgia is located on the western bank of said river, at high-water mark?

3. Has not the complainant described correctly the character of the bank of said river, and particularly that portion of the bank commencing at the 31st degree of north latitude, and extending sixty or seventy miles above?

4. Does not the water, at many places on the western side of said river, and south of the point where said line leaves the same for Nickajack, pass far beyond and west of the ordinary low-water mark?

5. Are not the banks of said river, at many places north of the 31st degree of north latitude, low and flat? and does not the water of said river, during the usual freshets, pass over the adjoining land, at some places as much as a half mile, at some places less, and at other places more than a half mile west of the ordinary low-water mark of said river?

6. Has not the complainant correctly set forth the first section of the articles of agreement and cession between the United States and the State of Georgia (and described in this bill) so far as is necessary to ascertain the boundary line between the States of Alabama and Georgia; and has not the complainant correctly described the titles by which the United States acquired the Alabama territory? And, if not, in what particular is the description defective, and what part of the articles of agreement and cession not set forth is material in ascertaining said line?

At December term, 1858, the State of Georgia answered, after reserving to herself all manner of advantage to be derived from demurrer or plea to the bill. The facts of the case, as stated by Alabama, were admitted, as was the conclusion that the eastern boundary of Alabama was the western boundary of Georgia, wherever that might be. This Georgia not only admitted for Alabama, but affirmed for herself.

The claim of Georgia and answer to the interrogatories propounded were as follows:

So far as this line runs along the western bank of the Chattahoochee river, Georgia denies that it runs along the usual or common low-water mark, but, on the contrary, she contends that it runs along the western bank at high-water mark, using high-water mark in the sense of the highest line of the river's bed; or, in other words, the highest line of that bed, where the passage of water is sufficiently frequent to be marked by a difference in soil and vegetable growth.

In answer to the specific questions which are propounded by the bill, the State of Georgia says, that so far as the Chattahoochee river is the dividing line between her and the State of Alabama, she does claim all the lands, and a right to exercise jurisdiction over all the lands on the western bank of said river up to high-water mark, using high-water mark in the sense just above explained. She says, in answer to the second question, that she does claim that the jurisdiction and soil all along the western bank of said river, up to high-water mark, belong exclusively to her, and that the line separating the State of Alabama from the State of Georgia is located on the western bank of said river, at high-water mark, using the term high-water mark in the sense before explained. To the third question, the State of Georgia says, that while she regards the description of the banks of the river given in the bill as being too highly drawn, yet she admits that it is more applicable to the southern part of the bank than to that part of it sixty or seventy miles above the 31st degree of north latitude; and she admits that in some places the banks are flat, but she says that in other places, especially on the upper and longer portion of the river, the banks are generally steep and well defined—so much so as to be familiarly known as "the bluffs of the Chattahoochee." To the fourth and fifth questions, Georgia says, that the banks of said river, at a number of places along the dividing line between the two States, are low and flat; and it is true that in freshets the water passes west of the low-water mark, as far, perhaps, as half a mile in some places, and, in a few places, perhaps even farther. To

the sixth and last specific question, Georgia answers, that the first section of the articles of cession from Georgia to the United States is set forth in the bill with substantial correctness, so far as this controversy can be affected by it, and that the exact words of that section are as before stated in this answer. Also, she admits that section to be the only one material to this issue. She admits that the title of the United States to the territory of Alabama was acquired from Georgia by the means described in the bill, but she does not admit the intimation that the United States had acquired a previous title from the State of South Carolina, nor can she perceive the relevancy of such an intimation to the present issue.

The evidence in the case was all documentary. There was filed for the complainant an argument by *Mr. Dargan* and one by *Mr. Phillips*, who also argued the case orally. It was also argued orally by *Mr. McDonald* and *Mr. Gibson*. These arguments partook rather of the character of a diplomatic negotiation than a forensic dispute, and the reporter declines to attempt to abbreviate them in a law book.

Mr. Justice WAYNE delivered the opinion of the court.

This case involves a question of boundary between the States of Alabama and Georgia.

Alabama claims that its boundary commences on the west side of the Chattahoochee river at a point where it enters the State of Florida; from thence up the river along the low-water mark, on the western side thereof, to the point on Miller's Bend, next above the place where Uchee creek empties into such river; thence in a line to Nickajack, on Tennessee river

Georgia denies that the line intended by the cession of her western territory to the United States runs along the usual low-water mark of the perennial stream of the Chattahoochee river, but that the State of Georgia's boundary line is a line up the river, on and along its western bank, and that the ownership and jurisdiction of Georgia in the soil of the river extends over to the water-line of the fast western bank, which, with the eastern bank of the river, make the bed of the river.

The difference between the two States must be decided by the construction which this court shall give to the following words of the contract of cession: " *West of a line beginning on the western bank of the Chattahoochee river, where the same crosses the boundary between the United States and Spain, running up the said river and along the western bank thereof.*"

In making such construction, it is necessary to keep in mind that there was by the contract of cession a mutual relinquishment of claims by the contracting parties, the United States ceding to Georgia all its right, title, &c., to the territory lying east of that line, and Georgia ceding to the United States all its right and title to the territory west of it.

We believe that the boundary can be satisfactorily determined and run in this suit, from the pleadings of the parties. notwithstanding their difference as to the locality and direction of it on the Chattahoochee river.

Georgia is interrogated in certain particulars in the bill, which the complainant thinks will produce answers illustrative of the right of Alabama to the boundary which is claimed. Georgia answers them separately, having previously given a correct and literal copy of the contract. It is as follows: "The State of Georgia cedes to the United States all the right, title, and claim, which the said State has to the jurisdiction and soil of the lands situated within the boundaries of the United States south of the State of Tennessee, and west of a line beginning on the western bank of the Chattahoochee river, where the same crosses the boundary line between the United States and Spain; running thence up the said river Chattahoochee, and along the western bank thereof, to the great bend thereof, next above the place where a certain creek or river called Uchee (being the first considerable stream on the western side above the Cussetas and Coweta towns) empties into the said Chattahoochee river; thence in a direct line to Nickajack, on the Tennessee river; thence crossing the said last-mentioned river; and thence running up the said Tennessee river, and along the western bank thereof, to the southern boundary line of the State of Tennessee."

In answer to the first question, Georgia admits what is

alleged in the bill in relation to the definition of the boundaries of the Territory of Alabama by an act of Congress, passed in eighteen hundred and seventeen, and the subsequent grant of admission of the State of Alabama into the Union with the same boundaries in the year eighteen hundred and nineteen; and the conclusion from it is, simply, that the eastern boundary line of Alabama is the western boundary line of Georgia, but that, so far as that line runs along the western bank of the Chattahoochee river, Georgia denies that it runs along the usual or low-water mark; but, on the contrary, Georgia contends that it runs along the western bank at high-water mark, using high-water mark in the sense of the highest water-line of the river's bed; or, in other words, the highest water-line of that bed, where the passage of water is sufficiently frequent to be marked by a difference in soil and vegetable growth.

Georgia also answers affirmatively the other interrogatory in the bill with the same qualification, that what she claims is a right to exercise jurisdiction over all the lands up to the water-line of the western bank of the river's bed.

Georgia also says, that while she regards the description of the banks of the river given in the bill as highly drawn, she admits it to be more applicable to the southern part of the bank than to that part of it sixty or seventy miles above the thirty-first degree of north latitude. It is admitted that in some places the banks are flat, but that in other places, especially in the upper portion of the river, the banks are generally steep and well defined, so much so as to be familiarly known as the "Bluffs of the Chattahoochee;" and that the banks of the river in a number of places along the dividing line between the two States are low and flat, and that in freshets the water spreads as far as half a mile beyond the line to the west, and in a few places further than the western line of the river's bed, over low lands, which Georgia does not claim to be under its jurisdiction.

These declarations and admissions upon the part of Georgia simplify the controversy, and narrow it to the claim of the respective parties as heretofore set forth.

The contract of cession must be interpreted by the words

of it, according to their received meaning and use in the language in which it is written, as that can be collected from judicial opinions concerning the rights of private persons upon rivers, and the writings of publicists in reference to the settlement of controversies between nations and States as to their ownership and jurisdiction on the soil of rivers within their banks and beds. Such authorities are to be found in cases in our own country, and in those of every nation in Europe.

Woolrych defines a river to be a body of flowing water of no specific dimensions—larger than a brook or rivulet, less than a sea—*a running stream, pent on each side by walls or banks.*

Grotius, ch. 2, 18, says a river that separates two jurisdictions is not to be considered barely as water, but as water confined in such and such banks, and running in such and such channel. Hence, there is water having a bank and a bed, over which the water flows, called its channel, meaning, by the word channel, the place where the river flows, including the whole breadth of the river.

Bouvier says banks of rivers contain the river in its natural channel, where there is the greatest flow of water.

Vattel says that the bed belongs to the owner of the river. It is the running water of a river that makes its bed; for it is that, and that only, which leaves its indelible mark to be readily traced by the eye; and wherever that mark is left, there is the river's bed. It may not be there to-day, but it was there yesterday; and when the occasion comes, it must and will—unobstructed—again fill its own natural bed. Again, he says, the owner of a river is entitled to its whole bed, for the bed is a part of the river.

Mr. Justice Story, in Thomas and Hatch, 3 Sumner, 178, defines shores or flats to be the space between the margin of the water at a low stage, and the banks to be what contains it in its greatest flow; Lord Hale defines the term shore to be synonymous with flat, and substitutes the latter for that expression. Mr. Justice Parker does the same, in 6 Mass. Reports, 436, 439.

Chief Justice Marshall says the shore of a river borders on

the water's edge; and the rule of law, as declared by the
court in 5 Wheat., 379, is, that when a great river is a bound-
ary between two nations or States, if the original property is
not in either, and there be no convention about it, each holds
to the middle of the stream.

Virginia, in her deed of cession to the United States of the
territory northwest of the Ohio, fixed the boundary of that
State at low-water mark on the north side of the Ohio; and
it remains the limit of that State and Kentucky, as well as of
the States adjacent, formed out of that territory. 3 Dana
Kentucky Reports, 278, 279; 5 Wheaton, 378; Code of Vir-
ginia, 1849, pp. 49, 34; 1 St. Ohio, 62. By compact between
Virginia and Kentucky, the navigation is free. A like com-
pact exists between New York and New Jersey, as to the
Hudson river and waters of the bay of New York and adja-
cent waters.

Webster's definition of a bank is a steep declivity rising
from a river or lake, considered so when descending, and
called acclivity when ascending.

Doctor Johnson defines the word bank to be the earth
arising on each side of a water. We say properly the shore
of the sea and the bank of a river, brook, or small water. In
the writings of our English classics, the two words are more
frequently used in those senses; for instance, as when boats
and vessels are approaching the shore to communicate with
those who are upon the banks.

Bailey, in his edition of the Universal Latin Lexicon of
Facciolatus and Forcellinus, says that ripa, the bank of a river,
is *extremitas terræ quod aqua alluitur et proprie dicitur de flumine;
ut litus de mare, nam hoc depressum est declive atque humile, ripa
altior fere est præruptior;* and again, *ripa recte definitur id quod
flumen continet, naturalem vigorem cursus sui tenens.*

Notwithstanding that there are differences of expression in
the preceding citations, they all concur as to what a river is;
what its banks are; that they are distinct from the shore or
flat, and as to what constitutes its channel.

With these authorities and the pleadings of this suit in
view, all of us reject the low-water mark claimed by Alabama

as the line that was intended by the contract of cession between the United States and Georgia. And all of us concur in this conclusion, that by the contract of cession, Georgia ceded to the United States all of her lands west of a line beginning on the western bank of the Chattahoochee river where the same crosses the boundary line between the United States and Spain, running up the said Chattahoochee river and along the western bank thereof.

We also agree and decide that this language implies that there is ownership of soil and jurisdiction in Georgia in the bed of the river Chattahoochee, and that the bed of the river is that portion of its soil *which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn.*

The western line of the cession on the Chattahoochee river must be traced on the water-line of the acclivity of the western bank, and along that bank where that is defined; and in such places on the river where the western bank is not defined, it must be continued up the river on the line of its bed, as that is made by the average and mean stage of the water, as that is expressed in the conclusion of the preceding paragraph of this opinion.

By the contract of cession, the navigation of the river is free to both parties.