1998 OK CR 74

**Stephen Eugene HANES, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. M–97–1401.**

Court of Criminal Appeals of Oklahoma.

Dec. 31, 1998.

Dissenting Opinion Feb. 9, 1999.

As Corrected Feb. 22, 1999.

Rehearing Denied March 1, 1999.

Ben Loring, Bill Culver, Ottawa County Dist. Attorneys, Miami, Oklahoma, for state at trial.

Chadwick Smith, Tulsa, Oklahoma, for defendant at trial.

Chadwick Smith, Tulsa, Oklahoma, for appellant on appeal.

W.A.Drew Edmondson, Attorney General of Okla., Steven E. Lohr, Assistant Attorney General, Oklahoma City, OK, for appellee on appeal.

## OPINION

LANE, J.

¶1 This case presents an issue of first impression: may the State of Oklahoma enforce its fishing regulations against a Cherokee Indian fishing at the water's edge on the

west bank of the Neosho or Grand River[1] at the city park in Miami, Oklahoma? To answer this question, we address two issues on appeal: 1) whether the riverbed of the Neosho or Grand River at the city park in Miami, Oklahoma is within Indian country, and 2) whether the State may enforce its protective fishing regulations against a Cherokee Indian fishing outside Indian country. We hold the site in question is outside Indian country, and the State has the power to enforce its protective fishing regulations against a Cherokee Indian there. Judgment and sentence is affirmed.

¶ 2 Stephen Eugene Hanes, a Cherokee Indian, was convicted in a bench trial for Illegal Possession of a Game Fish and Taking Game Fish Illegally (29 O.S.1991, § 6–302) in Ottawa County District Court Case No. WL 95–425 (consolidated). His defense, that the State lacks jurisdiction to enforce its fishing laws against an Indian in Indian country, was rejected by the trial court which imposed a fine of ten dollars for each Count. The trial court suspended the sentence pending the outcome of appeal.

¶ 3 The parties stipulated to the operant facts at trial. Hanes was arrested April 19, 1995, as he fished from the water's edge on the west bank of the Neosho or Grand River at the city park in Miami, Oklahoma. One blue catfish was on his line and a second was in his pickup truck which was parked in the lot above the west bank of the river. State law prohibited catching blue catfish. Hanes is a member of the Cherokee tribe. The riparian upland west of the river at this point was once part of the Cherokee Nation and had been allotted to a Cherokee Indian and later conveyed in fee simple to the City of Miami, Oklahoma. The parties also stipulated the Neosho or Grand River at the city park is navigable.

¶ 4 On appeal Hanes argues the trial court erred as a matter of law in finding the riverbed is not within Indian country. This is a mixed question of law and fact, for we must examine federal law and interpret federal treaties to determine whether, on the

facts of this case, Hanes may be convicted of a crime. *See Hallowell v. U.S .*, 209 U.S. 101, 28 S.Ct. 498, 52 L.Ed. 702 (1908). Mixed questions of law and fact are treated as questions of law on appeal, and so we review this issue *de novo*. *Taylor v. City of Oklahoma*, 782 P.2d 1363, 1365 (Okl.1989).

¶ 5 The United States Congress, which has plenary power over Indian matters, has defined Indian country as follows in 18 U.S.C. § 1151:

a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of way running through the reservation,

b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

¶ 6 Hanes concedes the riparian upland in question was allotted by the Cherokee Nation to an individual Cherokee tribe member in fee simple, and this land subsequently was conveyed in fee simple to the City of Miami. He does not claim the riparian upland is within Indian country. Rather, he argues the riverbed was granted to the Cherokee Nation by the United States, never allotted, and is retained by the Cherokee Nation today. If Hanes is correct, the riverbed is within Indian country as defined by 18 U.S.C. 1151(c).

¶ 7 None of the conveying instruments relevant to this case mention the riverbed. Therefore, the Court must apply well-established principles of interpretation to determine whether the United States conveyed an interest in the riverbed to the Cherokee Nation, and whether the principle

---

1. Both names, Neosho and Grand, have been assigned to the river since the earliest written record, and both names are used in the treaties relevant to this case. In keeping with this tradition, the Court will use both names as well.

chief of the Cherokee Nation conveyed an interest in the riverbed when he allotted[2] the riparian land. Well-settled law provides the interpretation of the United States' intent to convey a riverbed depends on whether the river is navigable. Absent language to the contrary, a riparian owner will be found to own the adjacent riverbed to the thread of the stream of non-navigable rivers. *St. Paul & P.R. Co. v. Schurmeir*, 7 Wall. 272, 287, 19 L.Ed. 74 (1868); *Brown v. Huger*, 21 How. 305, 320, 16 L.Ed. 125 (1858). Conveyance by the sovereign of any right to the bed of navigable waters, on the other hand, will not be inferred from a silent document, absent extraordinary countervailing circumstances. *United States v. Holt State Bank*, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926).

¶ 8 At trial the parties stipulated the Neosho or Grand River is navigable. On appeal, the State asks to be relieved of the stipulation, which, it asserts, is contrary to fact. When navigability is asserted as the basis of a right arising under the Constitution or laws of the United States, the Supreme Court has held it is necessarily a question of federal law to be determined according to the general rule recognized and applied in the federal courts. *United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926); *Brewer–Elliott Oil & Gas Co. v. United States*, 260 U.S. 77, 87, 43 S.Ct. 60, 64, 67 L.Ed. 140 (1922). We accept this characterization for purposes of appellate review, and relieve the State of its stipulation, for the parties lack the authority to enter into a binding stipulation on a question of federal law. We begin our analysis by determining *de novo* whether the Neosho or Grand River is navigable.

¶ 9 To determine whether the river is navigable, we have relied on physical and historical facts set forth in the *Navigability Study, Grand (Neosho) River from Mouth to Headwaters of Pensacola Lake*, a report to the Tulsa District Army Corps of Engineers in November, 1974, conducted under govern-

ment contract by Parcher–Haliburton–Heiliger, Inc. (hereinafter, *Navigability Study*). The Neosho or Grand River is a tributary of the Arkansas River. It rises in Morris County, Kansas, at Council Grove Reservoir and flows in a southeasterly direction approximately 480 miles to the Elk River in north-central Delaware County, Oklahoma. From this point, the Neosho or Grand River flows in a southerly direction approximately 104 miles to its confluence with the Arkansas River at Webbers Falls Lake in Muskogee County, Oklahoma. The city park in Miami is located at river mile 143.4[3] in Ottawa County in the northeast corner of Oklahoma.

¶ 10 Physical characteristics of the river channel have been determined by field studies and reconnaissance. From its mouth, to river mile 2.3 the channel is sufficient to accommodate barge traffic. *Id.* at 64. At river mile 3.3 the water level is only two feet deep at shoals, and then deepens to four feet or more to the Fort Gibson Dam at river mile 7.7. Above the dam, and to approximately river mile 40, barge and tow traffic is possible. *Id.* at 67. Above river mile 40, the channel becomes winding and shallow, and develops numerous gravel bars. *Id.* Past this point the channel again deepens and widens, and could accommodate commercial traffic to river mile 53.8. Above river mile 63.2, the channel becomes narrow and twisting, with mud banks and snags to approximately river mile 73, at which point the channel again becomes deep and well defined. The channel retains this characteristic until river mile 139 where it becomes narrower, shallower and more twisting until the first of numerous gravel bars, shoals and snags are encountered at approximately river mile 146." *Id.* at 72. The *Navigation Study* concludes:

> In summary, to allow modern commercial barge navigation from approximately river mile 2.3 to the headwaters of Pensacola Lake [approximately river mile 154], con-

---

2. Allottment, a term of art in Indian law, is the selection of specific land awarded to an individual allottee from a specific common holding. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 142, 92 S.Ct. 1456, 1466, 31 L.Ed.2d 741 (1972).

3. River miles are measured from the mouth of the river, in this case, the confluence with the Arkansas River.

siderable navigational improvement will be required, including extensive channelization, bank stabilization, widening and deepening of the existing Grand River channel over approximately 50% of its length, relocation of 20 bridge structures and numerous power lines, communications line and pipeline crossings, relocation of two existing low-water dams, lockage around three major dams and construction of at least four intermediate locks and dams to raise navigation traffic upriver. Additional dams might have to be constructed upstream to provide water to operate the upper reach of the navigation system, above river mile 135–145.

*Id.* at 79.

¶ 11 The historical record reveals the upper reaches of the Neosho or Grand River have been used for commercial travel. Researchers who compiled the *Navigability Study* consulted manuscript and archival collections of the Oklahoma Historical Society in Oklahoma City, the Federal Archive and Records Center at Fort Worth, Texas, the Missouri Historical Society in St. Louis Missouri, and the records of the Office of Indian Affairs for the Western Creek and Neosho Agencies as well as secondary sources of "accepted value." *Id.* at 61. They discovered the Neosho or Grand river was navigated prior to the Louisiana Purchase by French trappers, the Spanish, and Osage Indians. From 1802 until 1827 a trading post known as the Grand Saline, named for nearby salt springs, located at river mile 60 served the Osage who brought furs by water and land to the post for shipment to St. Louis. Evidence of commerce was found to river mile 153. *Id.* at 58–63.

¶ 12 With these facts in mind, we turn now to the test of navigability. The general rule applied by federal courts to determine navigability in the context of the rights of riparian owners to riverbeds, or land under water is as follows:

[S]treams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and that navigability does not depend on the particular mode in which such use is or may be had-whether by steamboats, sailing vessels or flatboats-nor on an absence of occasional difficulties in navigation, but on the fact, if it be fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.

*Brewer–Elliott Oil & Gas Co.*, 260 U.S. at 86, 43 S.Ct. at 63; *Oklahoma v. State of Texas*, 258 U.S. 574, 586, 42 S.Ct. 406, 411, 66 L.Ed. 771 (1922); *United States v. Cress*, 243 U.S. 316, 323, 37 S.Ct. 380, 383, 61 L.Ed. 746 (1916).

¶ 13 Applying this test, we find the Neosho or Grand River, in its natural and ordinary condition, lacks sufficient water and channel depth for at least fifty per cent of its length to support useful commerce. It is not navigable.[4] That the river supported some commerce in its upper reaches in the eighteenth and early nineteenth century is not, in our opinion, sufficient to satisfy the definition of navigability. Our finding of non-navigability is not influenced by the numerous manmade obstructions to navigation found on the river which include five major dams, thirteen low water dams, fifty three pipelines and eighty two bridges. *Report on Findings on Navigability, Grand (Neosho) River and Tributaries Arkansas, Kansas, Missouri, and Oklahoma,* U.S. Army Corps of Engineers, Tulsa District, February 1, 1979, pp.3–11.

¶ 14 We now examine the history of the riparian upland in order to determine who owns the riverbed west of the thread of the center of the stream. The city park is located on the riparian upland west of the river.

---

4. This holding is consistent with the United States Supreme Court ruling in *United States v. Grand River Dam Authority*, 363 U.S. 229, 230, 80 S.Ct. 1134, 1137, 4 L.Ed.2d 1186 (1960); and *Brewer–Elliott Oil & Gas Co. v. United States*, 260 U.S. 77, 79–80, 43 S.Ct. 60, 61, 67 L.Ed. 140 (1922). The Federal District Court for the Northern District of Oklahoma proclaimed, "there can be no doubt the Grand River is not navigable and never has been" in *Grand River Dam Authority v. Going*, 29 F.Supp. 316, 321 (N.D.Okla.1939).

Its legal description is: "the east 16.8 acres of Lot 14 Section 31, Township 28 north, range 23 east of the Indian Meridian." This land, as well as the entire Neosho or Grand River, lies within the more than 800,000 square miles of land west of the Mississippi River which the United States bought from France [5] in 1803 pursuant to the Louisiana Purchase Treaty. 8 Stat. 200. During the territorial period before Oklahoma statehood, the United States entered into three separate treaties with Indian nations which transferred ownership of the land which is now the city park.

¶ 15   In 1831 the United States entered into treaties with the Seneca Indians of Sandusky and the Mixed Band of Senecas and Shawnees of Lewiston, promising to grant them 60,000 acres of land west of the Neosho or Grand river in exchange for their tribal lands in Ohio. Treaty, February 28, 1831, 7 Stat. 348; Treaty, July 20, 1831, 7 Stat. 351. Less than two years later, these tribes, which had united into the United Nation of Senecas and Shawnees, "ceded, relinquished and forever quit claimed" to the United States, all of their land "on the west side of the Ne-o-sho or Grand River" in exchange for land "lying on the east side of the Ne-o-sho or Grand River ... bounded on the west by the Ne-o-sho or Grand River." Treaty, December 19, 1832, 7 Stat. 411.

¶ 16   Some two months later, the United States granted this land on the west side of the river to the Cherokee Nation. Treaty, February 14, 1833, 7 Stat. 411. That part of the boundary relevant to this case is described in the treaty as "... thence along the western Missouri line, to the land assigned the Senecas; thence on the south of the Senecas to Grand river, thence up said Grand river, as far as the south line of the Osage reservation." *Id.*

¶ 17   These treaties establish the river as the international boundary between Indian nations. Typical of the time, the treaties are silent as to ownership of the riverbed. This omission was not clarified thirty-four years later, when the United Nation of Senecas and Shawnees sold the westernmost tract of their land, "bounded on the west by the Ne-o-sho River," to the Ottawa Nation. Treaty, February 23, 1867, 15 Stat. 513.

■ ¶ 18   Any right of the Cherokee Nation to the riverbed of the Grand or Neosho River was established by the Treaty of February 14, 1833, subject to the preexisting right to the riverbed of the United Nation of Senecas and Shawnees. *See United States v. Elliott*, 131 F.2d 720, 723 (10th Cir.1942). Because the treaties themselves are silent, we look to the well-settled law of international boundaries to interpret the rights of the Cherokee Nation. When two nations are separated by a river, and no agreement exists to the contrary, the boundary between them is the middle of the stream. *Handly's Lessee v. Anthony*, 5 Wheat. 374, 378, 5 L.Ed. 113 (1820); *Alabama v. Georgia*, 23 How. 505, 514, 16 L.Ed. 556 (1859).

■ ¶ 19   The treaty language itself, as generally interpreted, supports this construction. The drafter of the treaty between the United States and the United Nation of Senecas and Shawnees stated only that the grant was "... bounded on the west by the Ne-o-sho or Grand River...." Treaty of December 19, 1832, 7 Stat. 411. The drafter of the treaty between the United States and the Cherokee Nation described the river boundary more specifically: ".. on the south of the Senecas to Grand river, *thence up said Grand river*, as far as the south boundary of the Osage reservation ..." (emphasis added) Treaty of February 14, 1833, 7 Stat. 411. This specific language, "... thence up said ... river," is a term of art consistently interpreted to set the boundary at the thread, or center, of the stream. *Howard v. Ingersoll*, 54 U.S. 381, 416, 14 L.Ed. 189 (1851). We find that portion of the eastern boundary of the Cherokee Nation relevant to the case

---

5. In 1682, Rene' Robert Cavelier, Sieur de La Salle claimed the Mississippi River Valley for France, and named it "Louisiane" to honor King Louis XIV. France transferred the Louisiana territory west of the Mississippi to Spain by secret treaty in 1772. In 1800, King Charles IV of Spain returned Louisiana to France by the Treaty of San Ildefonso, in exchange for the promise to establish a kingdom in Italy for his brother-in law. *Encyclopedia Americana*, vol. 17, pp796–97 and 799 (Grolier, 1997.).

before us to be the center of the thread of the stream of the Neosho or Grand River.[6]

¶ 20  In reaching this conclusion, we have considered the State's argument that the United States reserved the riverbed from its grant of land to the Indian nations and held it in trust for the State of Oklahoma. This argument is supported by well-established policy: "... disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or made very plain." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 634, 90 S.Ct. 1328, 1336, 25 L.Ed.2d 615 (1970) quoting *United States v. Holt State Bank*, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926).

¶ 21  We are not persuaded by the argument, for we find the United States' intention to convey this riverbed was both stated by treaty and supported by the surrounding circumstances. The United States Supreme Court has set forth very clearly the circumstances surrounding the creation of the Cherokee Nation in that territory which, seventy-four years later, also spawned the state of Oklahoma. *See Choctaw Nation*, 397 U.S. at 622–26, 90 S.Ct. at 1330–32. The United States granted this land to the Cherokees to provide them with an inviolate home. The lack of intent to reserve the riverbed for a future state is further supported by the language used in the treaty to describe the river boundary; language commonly understood to refer to the middle of the stream. This interpretation is consistent with express provision of Congress that Oklahoma enter into the Union on equal footing with her sister states, conditioned on her disclaimer of all right and title to lands "owned or held by any Indian Tribe or nation." Act of June 16, 1906, §§ 3, 4; 34 Stat. 270, 271.

¶ 22  Having established the Cherokee Nation was granted the riverbed of the Neosho or Grand River west of the center of the stream by the United States, we now determine whether the Cherokee Nation reserved the riverbed when it allotted the riparian upland. Setting the stage for Oklahoma's admission into the union, Congress, in 1893, created a commission to negotiate with those Indian tribes, located in what would become the state of Oklahoma, the allotment of land held in common by the tribe to individual tribal members. Act of March 3, 1893, 27 Stat. 645; *Choctaw Nation*, 397 U.S. at 627, 90 S.Ct. at 1332–33. The Cherokee Nation resisted this process initially, but ultimately agreed to it. Supplemental Cherokee Agreement of 1902. 32 Stat. 716. Any tribal property which was not allotted was to be "held in trust by the United States for the use and benefit of the Indians." Act of April 26, 1906, § 27, 34 Stat. 148.

¶ 23  Under this system of allotment, the principal chief of the Cherokee Nation conveyed to individual, enrolled members of the tribe "all the right, title and interest of the Cherokee nation," as well as any right, title or interest of the United States to the allottee. 32 Stat. 716 § 58. The parties stipulate, and the historical record confirms,[7] the riparian tract at issue in this case was allotted at this time. Cook, F., *Forgotten Oklahoma Records, "Cherokee Land Allotment Book"*, vol. 1, p. 369 (1981). Like the treaties before it, the allotment was silent as to ownership of the riverbed.

■ ¶ 24  We now decide the dispositive issue: did Cherokee Nation allot its interest in the riverbed of the Neosho or Grand River, or did it retain the riverbed which is now held in trust by the United States for the benefit of the tribe? To answer the question we return to the well-established rule of construction: absent language to the contrary, a riparian owner will be found to own the adjacent riverbed to the thread of the stream on non-navigable rivers. *St. Paul & P.R. Co. v. Schurmeir*, 7 Wall. 272, 287, 19 L.Ed. 74 (1868); *Brown v. Huger*, 21 How. 305, 320, 16

---

6.  As the eastern boundary of the Cherokee Nation was subject to the preexisting western boundary of the United Nation of Senecas and Shawnees, it is only reasonable to infer the boundary of the United Nation of Senecas and Shawnees to the east is also the thread of the stream of the Neosho or Grand river.

7.  Three year old Lawrence P. Hollis, an enrolled member of the Cherokee Nation, is the recorded allottee.

L.Ed. 125 (1858). Applying this rule to the case at hand, we find the Cherokee Nation allotted its interest in the riverbed of the Neosho or Grand River to the allottee of the riparian upland.

¶ 25 Since the chain of title to the land which is now the city park is not before us, we cannot determine the precise moment at which the riverbed slipped, unnoticed, out of Indian country. We can say with certainty, and we so hold, the conveyance in fee simple of the riparian upland which has become the city park to the city of Miami, Oklahoma, also conveyed an interest in fee simple to that part of the riverbed west of the thread of the center of the stream. The western half of the riverbed at the location of the Miami city park is not Indian country, for the Indian title has been extinguished. 18 U.S.C. § 1151(c).

¶ 26 Each of Hanes' arguments on appeal, with the exception of Proposition IV, turn on whether the site in question is Indian country. In Proposition I he argues the State has no criminal or territorial jurisdiction over Indian country. In Proposition II he argues the Cherokee Nation has retained its hunting and fishing rights within the Cherokee Nation proper. Proposition III asserts these hunting and fishing rights have been recognized by the United States Government by means of treaties and patents. In Propositions V and VI, Hanes asserts the State of Oklahoma has limited authority to impinge upon the hunting and fishing rights of the Cherokee Nation, and the State of Oklahoma has disclaimed any jurisdiction over the Cherokee Nation hunting and fishing rights. We address none of these arguments on the merits, for they all are based on the unsupportable claim the western bank of the Neosho River at the Miami city park is within Indian country.

¶ 27 In Proposition IV Hanes argues that, as a member of the Cherokee Nation, he retains the right to fish within the ancestral Cherokee Nation free of state regulation. The argument spans both Indian country and land outside Indian country. We do not address state regulation of fishing *within* Indian country, for those facts are not before us.

¶ 28 Separate and distinct from an individual's "right" to fish is the state's police power to regulate the time and manner of fishing necessary for the conservation of fish resources. *Puyallup Tribe v. Department of Game of Washington,* 391 U.S. 392, 399, 88 S.Ct. 1725, 1729, 20 L.Ed.2d 689 (1968). That the State possesses the power to regulate the right of an Indian to fish outside Indian country in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians, is beyond dispute. *Puyallup Tribe,* 391 U.S. at 398–99, 88 S.Ct. at 1728–29, quoting *United States v. Winans,* 198 U.S. 371, 384, 25 S.Ct. 662, 665, 49 L.Ed. 1089 (1905) and *Kennedy v. Becker,* 241 U.S. 556, 563–64, 36 S.Ct. 705, 707–08, 60 L.Ed. 1166 (1916).

¶ 29 Hanes was prosecuted under 29 O.S. 1991, § 6–302. The express purpose of this statute is to protect fish populations within the waters of Oklahoma. *Id.* At the time Hanes caught two blue catfish, catching this species was prohibited. Designating a season in which fish species may be caught is within the State's power to conserve its fish resources. The State was within its conservation power to determine that in the case of the blue catfish, no season would be designated.

¶ 30 No argument was made at trial that 22 O.S.1991, § 6–302 does not meet appropriate standards, or that it discriminates against Indians. Applying the authority of *Puyallup,* we find the State properly exercised its power to regulate the time Hanes could fish for blue catfish outside Indian country.

## DECISION

¶ 31 Judgment and sentence is **AFFIRMED.**

CHAPEL, P.J., and STRUBHAR, V.P.J., concur.

LUMPKIN, J., dissents.

JOHNSON, J., concurs in results.

LUMPKIN, Judge: Dissent.

¶1 I must respectfully dissent to the Court's decision in the above-styled case, together with the publication of the case. The Court has disregarded some very basic rules of appellate review.

¶2 As set out in Article 7, § 4, of the Oklahoma Constitution, "the Court of Criminal Appeals shall have exclusive appellate jurisdiction in criminal cases". Appellate jurisdiction is that power and jurisdiction to review and correct those proceedings of inferior courts brought for determination in the manner provided by law. *Carder v. Court of Criminal Appeals*, 595 P.2d 416 (Okl.1978); *State v. Cole*, 4 Okl.Cr. 25, 109 P. 736 (1910). As a result of this "appellate" jurisdiction, this Court is tasked with the responsibility of reviewing actions in the District Court to determine if the facts developed therein support the District Court's decision under the law.

¶3 This Court is not a fact-finder. We cannot create facts on our own. Therefore, the opinion mischaracterizes this Court's role when it states "[m]ixed questions of law and fact are treated as questions of law on appeal, and so we review this issue *de novo*." Black's Law Dictionary defines the term *de novo* as "anew; afresh; a second time." Even if such review was allowed under our "appellate jurisdiction," this opinion clearly goes outside the scope of merely reviewing anew the law and facts presented at the trial in this matter. Rather, the Court, in this opinion, seeks to create its own facts which have not been presented to the District Court, nor to this Court.

¶4 Contrary to the opinion's position regarding *carte blanche de novo* review, our jurisprudence reveals this Court has previously reviewed mixed questions of law and fact based upon an abuse of discretion standard, asking whether the trial court's findings of fact are supported by the record. *See e.g. Harris v. State*, 97 Okla.Crim. 259, 261 P.2d 909, 915 (1953)(competency of witness is a mixed question of law and fact to be determined by the trial court upon an examination of the witness; only a manifest abuse of judicial discretion will warrant interference with such decision on appeal).

¶5 The Court's failure to adhere to the proper scope of appellate review is a cancer which has metastasized in this opinion. In the District Court, the State and the Appellant stipulated that the river at the point where this incident occurred was navigable. That is the record upon which this Court should exercise its appellate jurisdiction. Instead of conducting an appellate review of the stipulations arising from the District Court, the Court allows the State to raise, for the first time on appeal, the issue of navigability and seek to be relieved from the stipulation upon which the trial court made its decision. I fail to find any legal authority for the Court's election to go outside the record presented to it to decide a question not presented to the District Court.

¶6 The error is then magnified when the opinion seeks to utilize cases which have not addressed the issue of navigability as to this particular tract of land. In relying on *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 633, 90 S.Ct. 1328, 1336, 25 L.Ed.2d 615 (1970), the opinion fails to recognize that case dealt with a different tract of land in an area where the Arkansas was navigable. In addition, the land at issue in that case was never allotted to tribe members by the Cherokees prior to the Act of April 26, 1906, an act which paved the way for Oklahoma's admission into the union on equal footing with the original states. The land at issue here was allotted.

¶7 If we assume the holding in *Choctaw Nation* applies to the instant tract of land, title passed from the United States to the Cherokee Nation. Thereafter, title passed from the Cherokee Nation to the individual Cherokee allottee and later the land was deeded to the City of Miami. If the Cherokees owned the riverbed, as per *Choctaw Nation*, the question then is whether the Cherokees passed title to the riverbed to its allottee. If it did, the Appellant loses. If it did not, title to the Neosho/Grand riverbed would arguably remain in the Cherokees via the United States as trustee. In this case the parties seem to agree the instruments are silent on this issue. However, that is the problem with this opinion and its "*de novo*"

review. The opinion is making assumptions which are not born out by the record. In addition, factual issues must be litigated to provide a record upon which this Court can then make a decision within the context of its appellate review. Based on the record properly before this Court at this time, there is no basis upon which this Court can make a factual finding the tract of river in question is not navigable.

¶ 8 There is no showing the State should be relieved from the stipulation it entered into in the trial court. Based on the State being bound to its stipulation and no showing being made to this Court as to how or why it should be relieved from that stipulation, together with the fact the Court has gone outside the record before us to reach its decision, I must dissent to the Court's decision.