STATE v. LAWHORN



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE v. LAWHORN

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE v. LAWHORN
2021 OK CR 37
Case Number: S-2020-858
Decided: 10/21/2021
THE STATE OF OKLAHOMA, Appellant v. JEREMY LAWHORN, Appellee
Cite as: 2021 OK CR 37, __ __

 

O P I N I O N
ROWLAND, PRESIDING JUDGE:
¶1 The State of Oklahoma charged Appellee Jeremy Lawhorn in the District Court of Ottawa County, Case No. CF-2020-189, with one count of Lewd or Indecent Acts with a Child Under 16, in violation of 21 O.S.Supp.2018, § 1123 (A)(2). Lawhorn filed a motion to dismiss, asserting that the State of Oklahoma lacked jurisdiction over the matter because he is an Indian and the offense occurred in Indian Country, specifically the Quapaw Nation Reservation. The district court held a hearing and concluded, based upon the stipulations and exhibits, that Lawhorn is an Indian for purposes of federal criminal law and that the crime occurred in Indian Country, namely within the historic boundaries of the Quapaw Nation Reservation. The district court granted Lawhorn's Motion to Dismiss, quashed the Information, and dismissed the case for lack of jurisdiction. The State announced its intent to appeal the ruling in open court to settle the status of the Quapaw Reservation and ultimately perfected the instant appeal. We exercise jurisdiction under 22 O.S.2011, § 1053. The sole issue for review is whether the Quapaw Nation Reservation is Indian Country. Because the answer is yes, we affirm the district court's order for the reasons discussed below.
DISCUSSION
A. The Major Crimes Act
¶2 The federal Major Crimes Act (MCA) grants exclusive federal jurisdiction to prosecute certain enumerated offenses committed by Indians within Indian Country. Sizemore v. State, 2021 OK CR 6, ¶ 6, 485 P.3d 867, 869; 18 U.S.C. § 1153(a) (2013). There is no dispute that the crime charged against Lawhorn fits squarely within the MCA and its exclusive federal jurisdiction provided he is an Indian and the crime occurred in Indian Country. See State v. Klindt, 1989 OK CR 75, ¶ 3, 782 P.2d 401, 403 ("[T]he State of Oklahoma does not have jurisdiction over crimes committed by or against an Indian in Indian Country.")
B. McGirt v. Oklahoma
¶3 In McGirt v. Oklahoma, 140 S.Ct. 2452 (2020), the Supreme Court held the reservation Congress established for the Muscogee (Creek) Nation remains in existence today because Congress has never explicitly disestablished it. That ruling meant Oklahoma lacked jurisdiction to prosecute McGirt, an Indian, because he committed his crimes on the Creek Reservation, i.e., in Indian Country, and the federal government has jurisdiction of such criminal matters under the MCA. Although the case now before us involves the lands of the Quapaw Nation, we find McGirt's reasoning controlling.
C. Status of Quapaw Reservation
¶4 The parties stipulated that the charged crime occurred within the historic geographic boundaries of the Quapaw Nation as designated by various treaties. The district court admitted, without objection, two treaties purportedly establishing a Quapaw Reservation, namely, the 1833 Treaty with the Quapaw, 7 Stat. 424 (May 13, 1833) and the 1867 Treaty with the Seneca, Mixed Seneca and Shawnee, Quapaw, etc., 15 Stat. 513 (Feb. 23, 1867). (Defense Exhibits 2 and 3).
¶5 The district court accepted the stipulation and concluded, without any opposition from the State, that the land set aside for the Quapaw Nation in the 1833 Treaty, as reaffirmed and modified by the 1867 Treaty, established a Quapaw Reservation. This finding is consistent with McGirt, and we adopt the district court's conclusion that Congress established a Quapaw Nation Reservation in the 1800s.
¶6 "To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress." McGirt, 140 S.Ct. at 2462. While no particular words or verbiage are required to disestablish a reservation, evidence of a clear expression of congressional intent to terminate the reservation is required. Sizemore, 2021 OK CR 6, ¶ 13, 485 P.3d at 870.
¶7 The record before the district court in this case, similar to that in McGirt, showed Congress, through a treaty, removed the Quapaws from one area of the United States to another where they were promised certain lands. A subsequent treaty redefined the geographical boundaries of those lands, but nothing in any of the documents showed a congressional intent to erase the boundaries of the Reservation and terminate its existence. Congress, and Congress alone, has the power to abrogate those treaties, and "this Court [will not] lightly infer such a breach once Congress has established a reservation." McGirt, 140 S.Ct. at 2462 (citing Solem v. Bartlett, 465 U.S. 463, 470, (1984)).
¶8 The District Attorney informed the district court that he and the Attorney General's Office conducted "extensive research" and found no evidence that Congress disestablished the Quapaw Nation Reservation. Noting that the State of Oklahoma presented no evidence to show Congress erased or disestablished the boundaries of the Quapaw Reservation, and citing McGirt, the district court concluded that the Quapaw Nation Reservation remains in existence and is Indian Country and that the State had no jurisdiction in this matter. This finding is supported by the record and we adopt it.
¶9 For these reasons, we hold, for purposes of federal criminal law, the land upon which the parties agree Lawhorn allegedly committed this crime is within the Quapaw Nation Reservation and is Indian Country. The ruling in McGirt governs this case and requires us to find the State of Oklahoma is without jurisdiction to prosecute Lawhorn.
DECISION
¶10 The ruling of the district court dismissing the case against Lawhorn based upon lack of jurisdiction is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2021), the MANDATE is ORDERED issued upon delivery and filing of this decision.
AN APPEAL FROM THE DISTRICT COURT OF OTTAWA COUNTY THE HONORABLE BECKY BAIRD, ASSOCIATE DISTRICT JUDGE




APPEARANCES IN DISTRICT COURT

APPEARANCES ON APPEAL


KENNY WRIGHT
DISTRICT ATTORNEY OF
OTTAWA COUNTY
102 E. CENTRAL AVE.
SUITE 201
MIAMI, OK 74354
ATTORNEY FOR STATE

KENNY WRIGHT
DISTRICT ATTORNEY OF
OTTAWA COUNTY
102 E. CENTRAL AVE.
SUITE 201
MIAMI, OK 74354
ATTORNEY FOR APPELLANT


ANDREW MELOY
ATTORNEY AT LAW
103 E. CENTRAL
SUITE 250
MIAMI, OK 74354
ATTORNEY FOR DEFENDANT

MARK P. HOOVER
OKLAHOMA INDIGENT
DEFENSE SYSTEM
P. O. BOX 926
NORMAN, OK 730704106
ATTORNEY FOR APPELLEE
WILSON PIPESTEM
MARY KATHRYN NAGLE
ABI FAIN
PIPESTEM & NAGLE, P.C.
401 S. BOSTON AVE.
SUITE 2200
TULSA, OK 74103
AMICUS CURIAE
FOR QUAPAW NATION

OPINION BY: ROWLAND, P.J.
HUDSON, V.P.J.: Specially Concur
LUMPKIN, J.: Concur in Results
LEWIS, J.: Concur




HUDSON, VICE PRESIDING JUDGE: SPECIALLY CONCURS
¶1 Today's decision dismisses a felony charge of Lewd or Indecent Acts With a Child Under 16 from the District Court of Ottawa County based on the Supreme Court's decision in McGirt v. Oklahoma, 140 S. Ct. 2452 (2020). The Ottawa County District Attorney commendably acknowledges that, after conducting his own extensive research, he has found no evidence showing the Quapaw Reservation was ever disestablished by Congress. Based upon the District Court's findings that Appellee is an Indian for purposes of federal criminal law, and that the crime in this case occurred within the historic boundaries of the Quapaw Reservation, we have no choice but to dismiss this case for lack of jurisdiction. Under McGirt, the State has no jurisdiction to prosecute Appellee for the crime in this case. Instead, Appellee must be prosecuted in federal court where the exclusive jurisdiction for this crime lies. See Roth v. State, 2021 OK CR 27, __P.3d__. I therefore as a matter of stare decisis fully concur in today's decision.
¶2 I write separately to re-urge my previous views on the need for a practical solution by Congress concerning criminal jurisdiction in eastern Oklahoma. With each passing day, more state criminal cases are dismissed pursuant to McGirt while more counties in Oklahoma are transformed into jurisdictional mine fields for the bench, bar and public. Ottawa County, nestled in Oklahoma's far northeastern corner, presents an extreme example. The county is famously known for being the boyhood home of baseball great Mickey Mantle (from Commerce).[1] Many Oklahomans, however, are less familiar with the vast tribal presence in this part of the state. They will soon be hearing much more about it. 
¶3 The federal government utilized much of present-day Ottawa County to resettle smaller tribes from around the country starting in the 1830s.[2] See Hanes v. State, 1998 OK CR 74, ¶¶ 15-16, 973 P.2d 330, 335. Today, Ottawa County is home to ten separate tribes--the Cherokee, Quapaw, Peoria, Ottawa, Miami, Modoc, Seneca-Cayuga, Wyandotte, Shawnee and Eastern Shawnee. According to the U.S. Department of Justice,[3] these Tribes' historic reservation lands cover the entire land mass of Ottawa County, an area consisting of roughly 485 square miles[4] and 30,000 residents.[5] One could easily mistake the map showing these historic tribal territories for a jigsaw puzzle with nine[6] pieces of varying shapes and sizes dividing up the puzzle board.
¶4 Since McGirt, we have recognized the existence of Indian country criminal jurisdiction within the historical reservation boundaries of the Cherokee Nation which covers a substantial portion of Ottawa County. See Hogner v. State, 2021 OK CR 4, ¶ 9, __P.3d__. Today's decision recognizes the ongoing vitality of a second reservation in Ottawa County--this one associated with the Quapaw Tribe--because there is no evidence showing it was ever disestablished by Congress. Other jurisdictional challenges to State authority to prosecute crimes in Ottawa County involving Indian defendants or victims are sure to follow concerning the other tribes. Some have already made their way to this Court and are in the process of being briefed. See, e.g., State v. Dixon, No. S-2021-205 (Ottawa); State v. Lee, No. S-2021-206 (Peoria and Miami).
¶5 Meanwhile, Congress neglects the practical effects of the McGirt decision on the local community and the cycle repeats: more reservations are recognized, more state criminal cases get dismissed and the public holds its breath wondering what will happen next. The failure of Congress to provide a practical solution to criminal jurisdiction in eastern Oklahoma in the post-McGirt universe has a real impact on real people--Indians and non-Indians alike--living on a reservation. Recently, we reversed a conviction for first degree manslaughter from Wagoner County involving an Indian child victim killed on the Creek Reservation by a non-Indian defendant. See Roth, 2021 OK CR 27, ¶¶ 2-3. That case is particularly tragic because there is a serious question whether it will be prosecuted in federal court due to issues surrounding the statute of limitations. Id., 2021 OK CR 27, ¶ 17. Local authorities too must run the gauntlet of performing routine law enforcement matters that may now involve one or more sovereigns depending upon the location of a crime and the status of the parties involved. And this is just the tip of the iceberg. See Hogner v. State, 2021 OK CR 4, __P.3d__ (Hudson, J., Specially Concurring) (discussing the practical problems associated with McGirt).
¶6 Congress has the ultimate authority to provide practical solutions in the post-McGirt world. It takes little imagination to understand how the most basic elements of law enforcement, from toll collection to traffic enforcement, are implicated by McGirt. The wholesale redistribution from state to federal court of a large number of criminal cases involving Indian defendants or victims highlights the extraordinary strain placed on the criminal justice system and presents its own set of problems. The post-McGirt fallout becomes more apparent with each passing day and deserves the attention of our elected representatives in Congress.
¶7 Recently, the Judicial Conference of the United States recommended that Congress add three new federal judgeships for the U.S. District Court sitting in Muskogee along with two new federal judgeships for the U.S. District Court sitting in Tulsa to handle the skyrocketing caseloads in both federal districts stemming from the filing of Indian country cases. The Conference reported a 400 percent increase in the number of criminal cases filed in the Eastern District of Oklahoma from 2020 to 2021 and a nearly 200 percent increase in the number of criminal cases filed in the Northern District of Oklahoma during the same time period.[7] According to local media reports, federal prosecutors from across America have volunteered to assist locally with these burgeoning caseloads after McGirt.[8] 
¶8 None of this is a surprise. Sadly, I am pessimistic the matter will be addressed by our elected representatives in Washington for the benefit of all. At this point, the clock is ticking. As Roth shows, both Indians and non-Indians alike have a vested interest in how the criminal justice system is administered in the post-McGirt world. The consequences of failure, however, are shockingly real and these issues should be tackled sooner rather than later.

FOOTNOTES
[1] See http://mickeymantle.com/bio/
[2] See also https://www.okhistory.org/publications/enc/entry.php?entry=OT003
[3] See https://www.justice.gov/usao-wdok/page/file/1303046/download
[4] See https://www.okhistory.org/publications/enc/entry.php?entry=OT003
[5] See https://www.census.gov/quickfacts/fact/table/ottawacountyoklahoma/POP060210
[6] The territory for the Shawnee and Eastern Shawnee tribes are shown as a single unit on the map used by the Department of Justice.
[7] https://www.uscourts.gov/news/2021/09/28/judiciary-supplements-judgeship-request-prioritizes-courthouse-projects (posted September 28, 2021)
[8] https://www.newson6.com/story/600114a2dbdb4a0bc5b4ab55/federal-prosecutors-move-to-oklahoma-to-help-with-supreme-court-caseload




LUMPKIN, JUDGE: CONCURRING IN RESULTS:
¶1 Bound by my oath and the Federal-State relationships dictated by the U.S. Constitution, I must at a minimum concur in the results of this opinion. While our nation's judicial structure requires me to apply the majority opinion in the 5-4 decision of the U.S. Supreme Court in McGirt v. Oklahoma, __ U.S. __, 140 S. Ct. 2452 (2020), I do so reluctantly. Upon the first reading of the majority opinion in McGirt, I initially formed the belief that it was a result in search of an opinion to support it. Then upon reading the dissents by Chief Justice Roberts and Justice Thomas, I was forced to conclude the Majority had totally failed to follow the Court's own precedents, but had cherry picked statutes and treaties, without giving historical context to them. The Majority then proceeded to do what an average citizen who had been fully informed of the law and facts as set out in the dissents would view as an exercise of raw judicial power to reach a decision which contravened not only the history leading to the disestablishment of the Indian reservations in Oklahoma, but also willfully disregarded and failed to apply the Court's own precedents to the issue at hand.
¶2 My quandary is one of ethics and morality. One of the first things I was taught when I began my service in the Marine Corps was that I had a duty to follow lawful orders, and that same duty required me to resist unlawful orders. Chief Justice Roberts's scholarly and judicially penned dissent, actually following the Court's precedents and required analysis, vividly reveals the failure of the majority opinion to follow the rule of law and apply over a century of precedent and history, and to accept the fact that no Indian reservations remain in the State of Oklahoma.[1] The result seems to be some form of "social justice" created out of whole cloth rather than a continuation of the solid precedents the Court has established over the last 100 years or more.
¶3 The question I see presented is should I blindly follow and apply the majority opinion or do I join with Chief Justice Roberts and the dissenters in McGirt and recognize "the emperor has no clothes" as to the adherence to following the rule of law in the application of the McGirt decision?
¶4 My oath and adherence to the Federal-State relationship under the U.S. Constitution mandate that I fulfill my duties and apply the edict of the majority opinion in McGirt. However, I am not required to do so blindly and without noting the flaws of the opinion as set out in the dissents. Chief Justice Roberts and Justice Thomas eloquently show the Majority's mischaracterization of Congress's actions and history with the Indian reservations. Their dissents further demonstrate that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed. I take this position to adhere to my oath as a judge and lawyer without any disrespect to our Federal-State structure. I simply believe that when reasonable minds differ they must both be reviewing the totality of the law and facts.
¶5 This particular case is further evidence of the error in analysis in the McGirt decision's failure to apply the Supreme Court's past precedents and analysis. Using the prior method of analysis of precedent set out by the dissent it would be readily recognized the Quapaw reservation was disestablished at Oklahoma statehood. Had Congress intended a different result, it surely would have expressly stated such intentions in the Enabling Act. Upon passage of the Enabling Act, Congress joined the former Indian Territory and Oklahoma Territory into one new state of Oklahoma and its sovereignty was established. The McGirt decision seeks to overrule an Act of Congress by eroding the State's sovereignty piecemeal, recognizing reservations long extinguished under the criteria set forth in Solem v. Bartlett. Tragically, this erosion of state sovereignty is being accomplished through this 5-4 decision in McGirt.
FOOTNOTES
[1] Senator Elmer Thomas, D-Oklahoma, was a member of the Senate Committee on Indian Affairs. After hearing the Commissioner's speech regarding the Indian Reorganization Act (IRA) in 1934, Senator Thomas opined as follows:
I can hardly see where it (the IRA) could operate in a State like mine where the Indians are all scattered out among the whites and they have no reservation, and they could not get them into a community without you would go and buy land and put them on it. Then they would be surrounded very likely with thickly populated white sections with whom they would trade and associate. I just cannot get through my mind how this bill can possibly be made to operate in a State of thickly-settled population. (emphasis added).
John Collier, Commissioner of Indian Affairs, Memorandum of Explanation (regarding S. 2755), p. 145, hearing before the United States Senate Committee on Indian Affairs, February 27, 1934. Senator Morris Sheppard, D-Texas, also on the Senate Committee on Indian Affairs, stated in response to the Commissioner's speech that in Oklahoma, he did not think "we could look forward to building up huge reservations such as we have granted to the Indians in the past." Id. at 157. In 1940, in the Foreword to Felix S. Cohen, Handbook of Federal Indian Law (1942), Secretary of the Interior Harold Ickes wrote in support of the IRA, "[t]he continued application of the allotment laws, under which Indian wards have lost more than two-thirds of their reservation lands, while the costs of Federal administration of these lands have steadily mounted, must be terminated." (emphasis added).




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1989 OK CR 75, 782 P.2d 401, STATE v. KLINDT
Discussed
 2021 OK CR 4, HOGNER v. STATE
Discussed
 2021 OK CR 6, 485 P.3d 867, SIZEMORE v. STATE
Discussed at Length
 2021 OK CR 27, ROTH v. STATE
Discussed at Length
 1998 OK CR 74, 973 P.2d 330, 70 OBJ 535, Hanes v. State
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 1123, Lewd or Indecent Proposals or Acts to Child Under 16
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 1053, State or Municipality May Appeal in What Cases
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA